*Suarez v. Sullivan, et al.*

# United States Court of Appeals

# For the Second Circuit

August Term 2024

Argued:  March 31, 2025
Decided:  March 17, 2026

No. 24-872

ELVIN SUAREZ,

*Plaintiff-Appellant*,

*v.*

ROBERT MORTON, Superintendent, Downstate Correctional Facility, in his individual capacity; ABDUL QAYYUM, Psychiatrist, Downstate Correctional Facility, in his individual capacity; PETER M. HORAN, Supervising Offender Rehabilitation Coordinator, Downstate Correctional Facility, in his individual capacity; MAURA L. DINARDO, Clinician, New York State Office of Mental Health, in her individual capacity; SAMANTHA L. KULICK, Psychology Assistant 3/Supervisor, New York State Office of Mental Health, in her individual capacity; BRANDON N. REYNOLDS, Psychiatrist, New York State Office of Mental Health, in his individual capacity; CHESNEY J. BAKER, Licensed Master Social Worker 2/Supervisor, New York State Office of Mental Health, in his individual capacity,

*Defendants-Appellees*,

ANN MARIE T. SULLIVAN, Commissioner, New York
State Office of Mental Health, in her individual
capacity; NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION; NEW YORK
STATE OFFICE OF MENTAL HEALTH; ANTHONY J.
ANNUCCI, Acting Commissioner, New York State
Department of Corrections and Community
Supervision, in his individual capacity; RYAN LAHEY,
Office of Mental Health Unit Chief, Downstate
Correctional Facility, in his individual capacity,

*Defendants*.[*]

---

Appeal from the United States District Court

for the Southern District of New York

No. 7:20CV07133,

Vincent L. Briccetti, *Judge*.

---

Before:      PARK, PÉREZ, and MERRIAM, *Circuit Judges*.

Plaintiff-appellant Elvin Suarez brought this action against the New York State Department of Corrections and Community Supervision ("DOCCS"), the New York State Office of Mental Health ("OMH"), and several DOCCS and OMH employees pursuant to 42 U.S.C. §1983, alleging that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. Suarez asserts two Eighth Amendment claims: (1) deliberate indifference to his conditions of confinement, and (2) deliberate indifference to his medical needs.

---

[*] The Clerk's Office is respectfully directed to amend the caption as reflected above.

The District Court granted defendants' motion for summary judgment in its entirety, concluding that no triable issues of fact existed on the record before it. We disagree and conclude that, construing the evidence in the light most favorable to Suarez, there are genuine disputes of material fact on both Eighth Amendment claims as to each defendant's knowledge of a serious risk to Suarez's health and well-being, and each defendant's disregard of that risk. We therefore VACATE the District Court's grant of summary judgment to defendants and REMAND for further proceedings consistent with this opinion.

VACATED AND REMANDED.

JUDGE PARK dissents in a separate opinion.

> ALEXANDRA M. AVVOCATO, Morrison & Foerster LLP, New York, NY (Jamie A. Levitt; Jocelyn E. Greer; Brian R. Matsui, Morrison & Foerster LLP, Washington, DC; Robert M. Quackenbush, The Legal Aid Society, New York, NY, *on the brief*), for *Plaintiff-Appellant.*

> ANAGHA SUNDARARAJAN (Barbara D. Underwood, Solicitor General; Judith N. Vale, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General, State of New York, New York, NY, *for Defendants-Appellees.*

SARAH A. L. MERRIAM, *Circuit Judge*:

Elvin Suarez was diagnosed in 2014 with a schizoaffective disorder. Since his initial diagnosis, his symptoms have fluctuated. When treated, he experienced periods of stability. But when he stopped taking medication, his

3

symptoms worsened and he decompensated. In 2017, while serving a sentence, Suarez was discharged from a psychiatric hospital to Downstate Correctional Facility ("Downstate") with a prescription for Zyprexa, an antipsychotic medication. Shortly after Suarez's arrival at Downstate, his assigned psychiatrist discontinued his prescription. Over the following two months, Suarez decompensated, had an altercation with an officer, and was placed in the Special Housing Unit ("SHU"), where he began hallucinating. After fifteen days in the SHU, a disciplinary hearing officer sanctioned Suarez to placement in "keeplock," another form of disciplinary housing, where he remained for two additional weeks until his release from Downstate. The day after Suarez was released, provoked by his hallucinations, he stabbed his mother multiple times.

Suarez sued the New York State Department of Corrections and Community Supervision ("DOCCS"), the New York State Office of Mental Health ("OMH"), and several DOCCS and OMH employees pursuant to 42 U.S.C. §1983 alleging, as relevant to this appeal, two violations of his Eighth Amendment rights. Specifically, Suarez alleged that defendants were deliberately indifferent to the serious risk that he would suffer significant mental health effects and decompensation by (1) placing him in disciplinary housing

4

and (2) providing him with inadequate medical treatment. The District Court granted summary judgment to each defendant on Suarez's Eighth Amendment claims, finding no triable issue of fact as to, *inter alia*, defendants' knowledge that Suarez was decompensating. The District Court rested this finding principally on the fact that Suarez did not tell anyone that he was hallucinating.

Because we conclude that the record presents genuine disputes of material fact on both Eighth Amendment claims as to each defendant's knowledge of a serious risk to Suarez's health and well-being, and each defendant's disregard of that risk, we hold that the District Court erred in granting summary judgment to defendants on Suarez's Eighth Amendment claims. We therefore **VACATE** the judgment and **REMAND** for further proceedings.

## I.  BACKGROUND

### A.  Suarez's Mental Health History

The facts are drawn from the record at summary judgment and are undisputed unless otherwise noted. Suarez has a well-documented history of mental illness. In 2014, Suarez began hearing voices and engaging in self-harm, after which he was diagnosed with Bipolar Disorder and prescribed anti-psychotic medication. Following his initial diagnosis, Suarez received inpatient

psychiatric treatment, was diagnosed with Bipolar Disorder, Episodic Mood

Disorder, Drug-Induced Psychotic Disorder with Delusions, and Psychosis, and

was prescribed anti-psychotic medications, anti-depressants, and mood

stabilizers. After his release from inpatient care, Suarez stopped taking his

medication and decompensated, exhibiting symptoms such as hallucinations,

delusions, depression, and laughing and talking to himself.

Suarez's symptoms fluctuated over time, with periods of relative stability

and periods of psychosis, during which he could become disoriented,

hallucinate, and sometimes attempt to harm himself. During one such period of

instability in 2015, Suarez was arrested; while in custody, he experienced

psychosis and exhibited "disruptive, confused or bizarre behavior." App'x

at 1956-57 (citation modified). He was placed in a mental health observation unit

and prescribed psychotropic medications. After a psychiatric examination

deemed him unfit to stand trial, Suarez was committed to Kirby Forensic

Psychiatric Center ("Kirby"), a maximum-security psychiatric hospital operated

by the New York State OMH, for restoration of fitness.

Suarez was evaluated at Kirby in connection with his refusal to take

psychotropic medications. During the evaluation, the examining psychologist

6

noted Suarez's out-of-context laughter, "which suggests he is responding to intrusive thoughts or other internal stimulation (i.e. hallucinations)." App'x at 1445. The examiner concluded that Suarez "lacks the capacity to make treatment decisions regarding medications for manic psychosis," that he "has knowledge of his diagnosis but disagrees with it and does not appreciate how the signs and symptoms of illness apply to him," and that his "lack of insight interferes with [his] ability to reason about whether to take medication." App'x at 1446. After two months of treatment, including medication compliance, Suarez's symptoms improved and he was discharged. Shortly after his release, however, Suarez stopped taking his prescribed medication and again decompensated.

## B.     Suarez's 2016 Arrest and Mental Health Treatment

Two months after his release from Kirby, Suarez was arrested and detained. He was again found unfit to stand trial and committed to Kirby for restoration of fitness. Upon arrival at Kirby, Suarez refused anti-psychotic medication; treatment records reflect that he evinced a belief that he was not mentally ill and did not need medication. On four occasions within Suarez's first month at Kirby, the medical staff administered emergency medication by

injection in response to instances of aggression or violence. After several weeks of treatment, Suarez's medication compliance improved, his mood stabilized, and he stopped having incidents of aggression. He was deemed fit to participate in the legal proceedings against him and discharged from Kirby.

Suarez's Kirby Discharge Summary, prepared by his treatment team, noted that he arrived at Kirby with "poor / non-compliance with his prescribed psychiatric medications." App'x at 1448. Under a section headed "ALERTS," the Discharge Summary stated: "Accepting facility to encourage medication compliance as patient will decompensate if non-compliant." App'x at 1448.

Suarez was sentenced to two years of imprisonment.

## C. Downstate Correctional Facility

On June 22, 2017, while serving that sentence, Suarez was transferred to Downstate Correctional Facility to serve the remainder of his prison term. Downstate principally operates as a reception and classification center for individuals being transferred to facilities controlled by DOCCS. We begin with an overview of the mental health services, relevant policies, and personnel at Downstate at the time of Suarez's incarceration there.

### 1. Mental Health Services

Because of its status as a reception center, Downstate typically housed individuals for between four to six weeks and lacked the longer-term mental health treatment programming available at other facilities. Still, Downstate is classified as a Level 1 facility and equipped with mental health services and providers, as well as a satellite unit – the Forensic Diagnostic Unit ("FDU") – a residential crisis treatment program that "provide[s] observation[] cells for individuals in acute psychiatric crisis either through self-injury, suicidal risk, or psychiatric decompensation." App'x at 704; *see also id.* at 1961, 1966.

Mental health services at DOCCS facilities, including at Downstate, are provided by OMH. *See* N.Y. Mental Hyg. Law §7.07; *see also* App'x at 1961-62. Level 1 facilities like Downstate are statutorily required to have OMH staff "assigned on a full-time basis and able to provide treatment to incarcerated individuals with a major mental disorder. The array of available specialized services include: residential crisis treatment, residential day treatment, medication monitoring by psychiatric nursing staff, and potential commitment to the central New York Psychiatric Center." N.Y. Correct. Law §2(27). At Downstate at the relevant time, there were about 25 on-site OMH staff, including a Mental Health Unit Chief, psychiatrists, mental health clinicians, social

9

workers, and nurses.  Meetings of the full OMH treatment team were held at least once a week to discuss concerns about specific patients.

"Each incarcerated person on the OMH roster at Downstate was assigned to an OMH clinician, who served as the patient's primary clinician, and a psychiatrist, who was principally responsible for prescribing psychiatric medication and providing medication counseling and education."  App'x at 1962. Downstate also had a full-time SHU clinician who served as the primary care clinician for all inmates housed in the SHU.

"By policy, within 48 hours of arrival at Downstate, every incarcerated person underwent an initial mental health screening interview to determine his mental health service needs."  App'x at 1965.  Based on the screening, individuals were classified by "level" indicating the need for mental health services; designations ranged from Level 1 (those with the greatest need for mental health services) to Level 6 (those with no need for mental health services).  Individuals receiving a Level 1 or 2 designation could also be designated as having a Serious Mental Illness ("SMI"); such inmates were classified as a Level 1-S or 2-S. Individuals classified as Level 1-S "were those OMH identified as having the most serious mental health diagnosis and the greatest need for mental health

10

treatment." App'x at 1965.

If the initial screening identified an individual as needing mental health services, that individual would undergo an additional screening – typically by the OMH clinician who was going to be the individual's assigned clinician – to determine diagnoses and treatment plans. The individual would also be assigned a primary psychiatrist. Together, the OMH clinician and psychiatrist would "prepare a 'Core History' and a treatment plan . . . within 30 days of the initial screening," and the primary clinician would meet with the patient to discuss those materials. App'x at 1966. Typically, an individual under OMH care would meet with a primary clinician and psychiatrist approximately every 30 days, during which the clinician was required by OMH policy to prepare treatment notes. In addition to these services provided by employees of OMH, *any* DOCCS employee was empowered "to write a mental health referral, referring an inmate to OMH, at any time." App'x at 1972.

A Joint Case Management Committee ("JCMC") met every other Thursday to review, monitor, and coordinate the treatment plans of Downstate inmates under OMH care who were housed in the SHU. At these meetings, the JCMC "reviewed and discussed each inmate with an SMI designation, going through

11

each inmate case by case." App'x at 1974. The JCMC meeting agenda specifically provided that the committee would review mental health treatment needs of SHU inmates to consider whether a "reduction in confinement sentence" or a "change in housing assignment" may be appropriate for an inmate. App'x at 1973. The JCMC also considered "any recommendations . . . that an inmate-patient be reevaluated by psychiatric staff with regard to current treatment needs." App'x at 1973.

### 2. Policies Regarding Imposition of Disciplinary Sanctions on Individuals with Serious Mental Illnesses

Downstate had several policies regarding disciplinary sanctions for individuals with SMIs, including policies designed to implement the requirements of New York law. At all relevant times, Downstate had two forms of disciplinary sanctions: the SHU, which constituted segregated confinement in a housing unit separate from general population, and keeplock.[1] Because

---

[1] At the time of Suarez's incarceration at Downstate, "segregated confinement" under New York law was defined as "the disciplinary confinement of an inmate in a special housing unit or in a separate keeplock housing unit" which are "housing units that consist of cells grouped so as to provide separation from the general population, and may be used to house inmates confined pursuant to the disciplinary procedures described in regulations." N.Y. Correct. Law §2(23) (effective until Mar. 21, 2022). Under the current version of the statute, "segregated confinement" is defined as "the confinement of an incarcerated

Downstate did not have separate keeplock housing units, keeplock sanctions were served in an inmate's cell within the general population. However, it is undisputed that the conditions of keeplock confinement were the same whether served in the general population or in segregated units: individuals in keeplock were subject to 23-hour lockdown in their cells.

When an individual is placed in segregated confinement for more than 24 hours, New York Correction Law requires that "the superintendent . . . arrange for the facility health services director, or a registered nurse or physician's associate approved by the facility health services director to visit such incarcerated individual" within the first 24 hours and, subsequently, "at least once in every twenty-four hour period thereafter, during the period of such confinement, to examine into the state of health of the incarcerated individual." N.Y. Correct. Law §137(6)(c).

The statute also provides that, with certain exceptions, "the department, in consultation with mental health clinicians, shall divert or remove incarcerated individuals with serious mental illness . . . from segregated confinement or

_____

individual in any form of cell confinement for more than seventeen hours a day other than in a facility-wide emergency or for the purpose of providing medical or mental health treatment." N.Y. Correct. Law §2(23) (currently effective).

confinement in a residential rehabilitation unit, where such confinement could potentially be for a period in excess of thirty days, to a residential mental health treatment unit." *Id.* §137(6)(d)(i).

At Level 1 facilities like Downstate, an individual placed in segregated confinement must be "assessed by a mental health clinician" within one business day. *Id.* §137(6)(d)(ii)(A). Generally, an individual with an SMI "shall be diverted or removed from segregated confinement or a residential rehabilitation unit," *id.* §137(6)(d)(ii)(C), unless (1) "the reviewer finds that removal would pose a substantial risk to the safety of the incarcerated individual or other persons, or a substantial threat to the security of the facility"; or (2) "the assessing mental health clinician determines that such placement is in the incarcerated individual's best interests based on his or her mental condition and that removing such incarcerated individual to a residential mental health treatment unit would be detrimental to his or her mental condition," *id.* §137(6)(d)(ii)(E).

Even if it is determined upon initial assessment that an individual with an SMI should *not* be removed from segregated confinement, the statute requires that the individual "*shall* be diverted to a residential rehabilitation unit and reassessed by a mental health clinician within fourteen days of the initial

14

assessment and at least once every fourteen days thereafter." *Id.* §137(6)(d)(ii)(D) (emphasis added). Moreover, "[i]ncarcerated individuals with serious mental illness who are not diverted or removed from a residential rehabilitation unit shall be offered a heightened level of mental health care, involving a minimum of three hours daily of out-of-cell therapeutic treatment and programming." *Id.* §137(6)(d)(iii). That level of care, however, is not required where "an incarcerated individual with serious mental illness does not, in the reasonable judgment of a mental health clinician, require the heightened level of care." *Id.* §137(6)(d)(iii)(A).

OMH policy required each OMH clinician to prepare progress notes documenting treatment provided to a patient. Progress notes taken during an OMH clinician's meeting with a patient were included in the patient's OMH chart. As discussed *infra*, each defendant had access to and reviewed Suarez's OMH chart.

At any time, and regardless of whether an individual was housed in general population, keeplock, or the SHU, any OMH employee could place the individual in the FDU, even if the individual was scheduled for a disciplinary hearing or sanction. And any DOCCS employee could request a consult with

15

OMH for an individual "to be seen immediately regardless of the day of the week."  App'x at 711.

### 3. Relevant Personnel

#### a. OMH Staff

At all times relevant to this appeal, Ryan Lahey served as the Mental Health Unit Chief at Downstate with ultimate responsibility for ensuring that OMH staff at Downstate followed OMH policies and procedures.[2]  Lahey's responsibilities included supervising and providing input on inmates' treatment plans; reviewing treatment plans; and reviewing, approving, and signing off on initial mental health service level designations.  Lahey also chaired the JCMC and held OMH treatment team meetings once a week, during which OMH staff discussed any concerns about specific patients.

OMH clinician Defendant Samantha Kulick[3] served as "Suarez's assigned primary clinician from his admission to Downstate on June 22, 2017, until his placement in . . . [the] SHU on August 8, 2017."  App'x at 1964.  After he was

---

[2]  Suarez does not appeal the District Court's grant of summary judgment to Lahey; Lahey is therefore not an appellee.

[3]  Since the events giving rise to this lawsuit, Kulick has changed her last name. For consistency with the parties' submissions and the record on appeal, we refer to her as "Kulick."

placed in the SHU, Suarez's primary care clinician became Defendant Maura DiNardo, Downstate's "SHU Clinician." App'x at 1964. Defendant Abdul Qayyum was Suarez's assigned psychiatrist at Downstate, when Suarez was not housed in the SHU. Defendant Chesney Baker was an OMH social worker and pre-release coordinator at Downstate, responsible for arranging post-release mental health services for Suarez. Defendant Brandon Reynolds was an OMH psychiatrist who, as relevant here, initially assessed Suarez's eligibility for Assisted Outpatient Treatment ("AOT") following his release from Downstate.

### b.     DOCCS Non-Medical Staff

Defendants Robert Morton and Peter Horan were DOCCS employees who were not OMH staff. Morton was the Superintendent of Downstate. As Superintendent, Morton was responsible for the supervision and management of Downstate, including the facility's compliance with applicable guidelines, laws, rules, and regulations. Morton visited the SHU weekly to ensure compliance with policies and procedures, and to check on the wellbeing and condition of each inmate. Morton also reviewed, noted any objections to, and signed off on recommendations of the JCMC; reviewed and signed off on deprivation orders (orders depriving SHU inmates of the typical one-hour-per-day of recreational

time) exceeding seven days; and reviewed and signed off on Tier 3 disciplinary sanctions (the most severe disciplinary sanction).

Horan was the Supervising Offender Rehabilitation Coordinator ("SORC"). In that capacity, he held disciplinary hearings at Downstate to determine the appropriate sanctions for inmates accused of disciplinary violations.

### D. Suarez's Incarceration at Downstate

#### 1. Admission and Initial Evaluation

Suarez arrived at Downstate on June 22, 2017, received his initial mental health screening that same day, and was referred for further OMH evaluation. Kulick, Suarez's assigned primary OMH clinician, conducted his OMH intake evaluation the following day, during which she began drafting a screening admission note and "Treatment Needs/Service Level Designation" form detailing Suarez's history of mental health treatment, including his diagnoses. In the admission note, Kulick reported Suarez's Zyprexa[4] prescription – with which he arrived at Downstate – and his "[m]ental health history, [s]ubstance

---

[4] Zyprexa is a branded version of the generic-named product Olanzapine, an anti-psychotic.

abuse/dependence history, [h]istory of psychiatric hospitalizations, [p]rior suicide ideation/threats/gestures/attempts, [and] [i]mpulsive behavior." App'x at 492-93. She also noted that, at the time of his admission, "[s]uicidal/homicidal ideation, intent, and plan are persuasively denied" and that "[n]o hallucinations, delusions, obsessions, phobias, or over-valued ideas are elicited." App'x at 492. Kulick recommended a Level 1 designation for Suarez, with a preliminary diagnosis of "[s]chizoaffective disorder, Bipolar type," and an indication that further diagnosis was deferred. App'x at 493.[5] Kulick testified that her initial recommendation was based on Suarez's active Zyprexa prescription and his two prior hospitalizations at Kirby. On June 27, 2017, Kulick completed the initial screening process and recommended Suarez be admitted to OMH for individual therapy and medication. Suarez's comprehensive suicide risk assessment, as prepared by Kulick, noted that if the treatment team observed signs of "suicidality and psychiatric decompensation," then Suarez "may benefit from a medication evaluation and/or [residential crisis treatment program] admission." App'x at 1440. It also identified "disciplinary sanctions" and "single [c]ell"

---

[5] Lahey, who signed off on initial mental health service level designations, "officially designated Mr. Suarez a Level 1-S patient" on June 30, 2017. App'x at 1984.

19

housing as potential risk factors, and indicated that "loss of . . . contact with support system or psychiatric decompensation" were possible "triggers" for self-harm. App'x at 1440.

On June 30, 2017, Suarez met with Qayyum, his assigned OMH psychiatrist, for his initial psychiatric evaluation. At that evaluation, Suarez reported his history of self-harm and auditory hallucinations but told Qayyum: "I don't need meds." App'x at 500. Qayyum discontinued Suarez's Zyprexa prescription and recommended that Suarez "cont[inue] ind[ividual] therapy" and have a follow-up appointment with Qayyum two weeks later. App'x at 501. Qayyum checked a box on the progress note indicating that he provided "medication education" to Suarez, but provided no further information about any such medication education in the narrative "comments" section. App'x at 501.[6]

Suarez was next seen by OMH staff three weeks later; the record does not

---

[6] Suarez asserted as an undisputed statement of fact: "There is no evidence that Defendant Qayyum informed anyone that he had discontinued Mr. Suarez's medication." App'x at 1986. Defendants did not contest the accuracy of this statement, but objected to the statement on the ground that it "argues that Dr. Qayyum had an affirmative obligation to advise others" of the discontinuation of the prescription. App'x at 1986. Pursuant to OMH policy, Qayyum's progress notes were included in Suarez's OMH chart, which was available to all defendants.

reflect a follow-up with Qayyum two weeks after their initial meeting. On July 19, 2017, Suarez had a follow-up with Kulick, during which she prepared his Core History form to be used as a reference for Downstate staff. In it, Kulick noted that Suarez arrived with "an active medication order for Zyprexa," that he "reports he is prescribed medication for mood swings," "endorses experiencing auditory hallucinations that 'tell me to hurt myself,'" and "endorses compliance with his medication and believes same are effective in treating his psychiatric symptoms." App'x at 1434. While the Core History form did not reflect that Suarez's prescription was discontinued three weeks earlier, Kulick testified that she was aware that Suarez "did not want to take the medication anymore and the psychiatrist [Qayyum] had discontinued it." App'x at 816.

Two days later, on July 21, 2017, Suarez saw Qayyum again. Suarez continued "declining med[ication]" and "den[ying] AH/VH," or auditory and visual hallucinations, but Qayyum's progress notes reflect that Suarez presented with "mood and affect slightly blunted." App'x at 563-64. Qayyum again checked the box on the progress note that said "medication education provided," but gave no details, and the handwritten notes reflect no such education. App'x at 564. The parties dispute whether such medication education was actually

21

provided.

Also in late July 2017, Baker, in her capacity as pre-release coordinator, began reviewing Suarez's records to begin the pre-release planning process; she met with Suarez on August 3, 2017, to discuss his post-release mental health care. During that meeting, Baker noted that Suarez "endorses his medication[] Zyprexa . . . w[as] discontinued due to his refusal, and believes 'I don't need them.'" App'x at 575. Baker's notes reflect that Suarez's "[t]hought processes appear logical," "[h]is eye contact is appropriately maintained," and "[n]o hallucinations, delusions, obsessions, phobias, or over-valued ideas are elicited." App'x at 576.

## 2. Suarez's detention in the SHU

On August 8, 2017, Suarez was involved in an altercation with DOCCS officers, during which he kicked them and made verbal threats against them. An Unusual Incident Report documenting the altercation, signed by Morton, reported that Suarez was "arguing with staff and acting unpredictable," and, once he was escorted to the infirmary, he "began spitting at staff," after which a spit mask was placed on his face. App'x at 1739-40. The notes from the infirmary also report that Suarez was lethargic, "off by 2 days w[ith the] current

22

date," and that although he had been "[o]n Zyprexa in recent past," it had been discontinued "due to p[atient] refusing." App'x at 1557. The infirmary physician requested an "immediate emergency phone referral" for a mental health evaluation. App'x at 1994.

In response to the referral, Kulick met with Suarez in the infirmary. Her progress notes indicate that Suarez was wearing "a spit mask covering his head and face" but that he "appear[ed] calm" with a "neutral" mood, had an affect "within normal range and congruent to mood," "fair" "insight and judgment," did not have "hallucinations, delusions, obsessions, phobias or over-valued ideas" and denied "[p]erceptual disturbances of any kind," but that "[h]is eye contact [was] sporadic." App'x at 502. Kulick noted that Suarez "denies drug use; however, it is suspected that he may be under the influence." App'x at 502.

On August 8, 2017, Suarez was placed in the SHU, where he remained for fifteen days until August 22, 2017. While he was in the SHU, DiNardo became Suarez's primary clinician. DiNardo conducted an initial mental health interview during which Suarez denied experiencing auditory hallucinations. For his first seven days in the SHU, Suarez was subject to a deprivation order, which

23

prohibited him from leaving his cell for the usual one hour of recreation time.[7]

Additionally, on August 11, 2017, the OMH AOT Coordinator emailed several Downstate staff members, including Qayyum and Baker, stating that Suarez "meets criteria [for AOT] as evidenced by hospitalizations following noncompliance with treatment." App'x at 2001-02. The email attached the Discharge Plan from Kirby.

The parties dispute the level of care Suarez received while housed in the SHU. Suarez testified in his deposition that, shortly after being placed in the SHU, he began hearing voices saying: "When you get out of here you have to protect yourself." App'x at 383. He further testified that he started having "anxiety attacks because [he] couldn't leave [his] cell." App'x at 383. He testified that he did not tell anyone about those voices. Suarez contends that he was unable to speak with a mental health clinician about the symptoms he was experiencing in the SHU because "they didn't offer [him] the services" while he was there. App'x at 383. Defendants assert that DiNardo made daily weekday "rounds" of the SHU and that Suarez appeared stable at all times, was "even-

---

[7] The parties dispute whether Morton signed off on the initial deprivation order placed on Suarez on August 8, 2017. It is undisputed, however, that Morton discontinued the order on August 15, 2017, seven days after Suarez was placed in the SHU.

24

keeled," and "did not display any symptom relating to his mental illness" or "advise [DiNardo] of any concerns." App'x at 414.

While Suarez was housed in the SHU, he had a Tier 3 disciplinary hearing beginning on August 15, 2017, regarding his altercation with DOCCS; Horan was the assigned hearing officer. In advance of the hearing, Horan received a hearing packet, which included a misbehavior report, Suarez's SMI status, and documentation showing that Suarez was housed in the SHU. Horan had the authority to release an incarcerated person from confinement prior to the start of a hearing, but he did not do so for Suarez. Horan testified that Suarez "seemed to be a little bit off" during the hearing, App'x at 1893, "lack[ed] connection," and was not "completely free of any signs of mental illness," App'x at 2018. During the hearing, "Suarez told Defendant Horan that he did not know what OMH was and did not know whether he was being treated by them. He also indicated that he did not understand the nature of some of the charges against him." App'x at 2014. As a result, Horan adjourned the hearing to obtain confidential OMH testimony regarding Suarez's mental health.

Several events occurred after the disciplinary hearing was adjourned. First, Suarez met with Baker to review his post-discharge plans. Baker's

25

treatment notes report that Suarez "does not believe he has a mental health problem," "does not feel any different on or off medication," and "denies experiencing psychiatric symptoms," but that Suarez's "[i]nsight and judgment are poor." App'x at 582-83. The parties dispute whether the JCMC met on August 17, 2017, during the disciplinary hearing hiatus. "Lahey testified that if the JCMC meeting took place it would have taken place on August 17, 2017," but defendants deny that there is any evidence that such a meeting occurred. App'x at 2003-04. Suarez asserts that, if it met as scheduled, the JCMC would have reviewed his file and could have recommended a "time cut" from the SHU. App'x at 2003. Finally, on August 17, 2017, Suarez met with Reynolds to evaluate whether Suarez was eligible for AOT. Reynolds noted that Suarez presented with a "mildly elevated" affect "with frequent and inappropriate smiling and laughter." App'x at 504. Reynolds reported that Suarez "does not believe he suffers from a mental illness, . . . denies hearing any voices in a long time," and "otherwise denies several other elements of his mental health history, such as taking multiple antipsychotics." App'x at 504. He also indicated that Suarez asserted he had been "'lying about taking medication' at the time of his Instant Offense (assaulting an officer)" and admitted to using K2 while in custody.

App'x at 504.  Reynolds noted that Suarez's insight was "poor."  App'x at 504.

The hearing resumed on August 21, 2017, to take mental health testimony from DiNardo.  DiNardo testified: "The behaviors exhibited by [Suarez] that are consistent with his current diagnosis include mood fluctuation and psychosis."  App'x at 1165.  She further stated that "[a]t the time of the incident, [Suarez] was prescribed Zyprexa . . . which was discontinued due to his noncompliance."  App'x at 1165.  DiNardo concluded: "It is my clinical opinion . . . that the conduct related to the disciplinary hearing is related to [Suarez's] mental health symptoms" and that Suarez "is not suitable for confinement in disciplinary housing due to the mental illness."  App'x at 1165-66.

That same day, Morton submitted a petition for an AOT order for Suarez.  In the petition, Morton stated:

> Mr. Suarez has a significant history of mental health problems.  The respondent also has a history of hospitalization related to mental illness, substance abuse, and non-compliance with treatment.  Due to respondent [sic] continued lack of insight into his mental illness and the need for treatment, there is nothing to indicate that the respondent will change his pattern of treatment non-compliance with resultant psychosis and high risk behaviors without the benefit of court-ordered treatment.

App'x at 1261.  As part of the AOT petition, Reynolds submitted an affirmation, in which he stated: "When non-compliant with psychiatric treatment, [Suarez]

27

experiences auditory hallucinations, mood lability, and suicidal ideation. He also has a history of violence towards self and others." App'x at 1265. Reynolds also noted that "Suarez's Zyprexa medication had been discontinued approximately five weeks prior, due to his refusing to take medication." App'x at 1266.

On August 22, 2017, Horan found Suarez guilty and imposed a sanction of fourteen days of time served in the SHU, and sixty days of keeplock time with thirty of those days suspended.[8] The sanction imposed by Horan exceeded the applicable DOCCS guidelines, which required that individuals with SMI designations who received greater than 30 days of disciplinary sanctions be referred to a special program absent exceptional circumstances. *See* N.Y. Correct. Law §137(6)(d)(i). Horan testified that he imposed that sanction because he "wanted [Suarez] out of [the] SHU as quickly as possible." App'x at 1092. While Horan had the authority to refer Suarez to OMH, and had made such referrals in the past, he testified that, by 2017, "OMH was involved with every mental hygiene case," and therefore he did not make a referral for Suarez. App'x at 1078, 2026.

---

[8] Also on August 22, 2017, DiNardo met with Suarez; DiNardo documented "no signs of psychiatric decompensation" after that meeting. App'x at 414-15.

28

On August 23, 2017, Morton reviewed and approved the sanction imposed on Suarez. In the "reason for decision" field, Morton stated simply: "This penalty should not be reduced." App'x at 919; *see also* App'x at 2028. DOCCS Acting Assistant Commissioner Finnegan emailed Morton on August 24, 2017, pointing out that Suarez's punishment "exceeded the confinement sanction guideline," that Morton's "review still leaves the confinement sanction OVER the guidelines," and "as such," Morton needed to send "the hearing record sheet, misbehavior report, both disposition pages, and [his] justification" to Finnegan for his review. App'x at 918; *see also* App'x at 2029. The record does not reflect whether Morton did so.

### 3. Time in Keeplock and Release from Downstate

On August 24, 2017, Qayyum met with Suarez, who was then in keeplock status. Qayyum's progress note indicates that Suarez was "coherent" but "laughing inappropriately" and "denies AH/VH," or auditory and visual hallucinations, and declined medication. App'x at 565-66. The next day, Suarez met with Reynolds and Baker for an AOT exam. Although Suarez refused medication and denied experiencing psychiatric symptoms, Reynolds noted that his "affect remains mildly elevated, with inappropriate smiling and laughter"

29

and "insight poor." App'x at 506.

On August 31, 2017, "OMH obtained a court order" – the AOT – requiring Suarez to undergo the one-year post-release treatment plan prepared by Reynolds, App'x at 2031, which included a requirement that he "take psychiatric medication as prescribed," App'x at 1269.

"On September 2, 2017, Mr. Suarez's mother and sister visited him at Downstate." App'x at 2032. Suarez's sister testified in her deposition that Suarez "was talking to himself again, and he just wasn't physically there – no eye contact, no talking to us" and that he was "throwing up." App'x at 823-24.

Three days later, on September 5, 2017, Suarez was released from Downstate and transferred to a Staten Island parole office to meet with his parole officer and post-release mental health care coordinator, both of whom reported that he was smiling and laughing to himself inappropriately. Suarez returned to his mother's home, where she "observed him 'pacing, giggling, and carrying on conversations when he was alone,' and appearing angry and nonsensical." App'x at 2034. The next day, Suarez met with his parole officer, who reported that Suarez "mumbled and talked to himself," and "appeared to be in need of medication." App'x at 2034 (citation modified). Suarez testified: "[W]hen I got

30

home I was already hearing voices" that told him "I have to protect myself because somebody dear to me was going to hurt me and I have to[] make sure I stay safe." App'x at 388.

On the evening of September 6, 2017, "Suarez attacked his mother with a kitchen knife, stabbing her multiple times in the chest, face and arms." App'x at 2034. He was arrested and evaluated; on October 4, 2017, Suarez was deemed unfit "to proceed in the defense of his case." App'x at 2035. The evaluators noted that he appeared "suspicious and guarded" and that he "smiled in an odd manner for no apparent reason." App'x at 2035. One of those evaluators also noted that Suarez's "thinking was irrational and rigid" and that he had "significant difficulty processing verbally conveyed information." App'x at 2035. At the time Suarez commenced the instant lawsuit, he was committed to Kirby.

E.    Suarez's Deposition Testimony

Suarez testified that no one at Downstate "discuss[ed] with [him] what if anything . . . you should do if you wanted mental health treatment." App'x at 381. He testified that he does not remember the altercation with DOCCS officials on August 8, 2017, and does not recall the disciplinary hearing. *See* App'x at 382 ("I recall not having a hearing."). Suarez further testified that he did not "recall

31

meeting with a mental health clinician," while he was in the SHU, App'x at 382,

but that he does recall meeting with "the doctor that took me off the medication,"

that is, Qayyum, and that Suarez "asked him if [he] could get off of it," App'x at

385. Suarez testified that while he was housed in the SHU, he "started hearing

v[o]ices again and they came and went, but they weren't there permanently. At

the same time, . . . I had anxiety attacks because I couldn't leave the cell." App'x

at 383. He testified that he never asked a correction officer if he could speak to a

mental health clinician, because he "was not in the right state of mind to think of

things like that." App'x at 383.

## II.    PROCEDURAL HISTORY

In September 2021, Suarez brought this action against DOCCS and OMH,

as well as certain DOCCS and OMH employees in their individual capacities:

Morton, Qayyum, Horan, Kulick, DiNardo, Reynolds, and Baker.[9] In the Second

Amended Complaint – the operative complaint – Suarez asserted six causes of

action, only two of which are before us on appeal.[10] Specifically, Suarez alleges,

---

[9] Suarez also named as defendants Anthony Annucci, the DOCCS Acting Commissioner; Ann Marie T. Sullivan, the OMH Commissioner; and Ryan Lahey, the OMH Unit Chief at Downstate. Suarez does not appeal the District Court's grant of summary judgment to those defendants.

32

pursuant to 42 U.S.C. §1983, that each individual defendant violated his Eighth Amendment right to be free from cruel and unusual punishment by (1) placing him in segregated confinement despite his psychiatric needs and (2) failing to provide him with adequate mental health treatment.

The District Court granted summary judgment to each defendant on Suarez's Eighth Amendment claims. *See Suarez v. Annucci*, No. 7:20CV07133(VB), 2024 WL 814664 (S.D.N.Y. Feb. 27, 2024). As to Morton, the District Court held that there were no genuine disputes of material fact regarding his subjective awareness that Suarez was actively decompensating or at substantial risk of doing so, and that no reasonable juror could find that Morton disregarded any risk to Suarez's health because he "acted to protect [Suarez] from harm." *Id.* at *13. The District Court found as to Horan, although he "was indisputably aware of [Suarez]'s serious mental illness designation," he "subjectively intended . . . to remove [Suarez] from segregated confinement as soon as possible" and

---

[10] Suarez brought the following additional claims, none of which are at issue on appeal: (1) disability discrimination, in violation of Title II of the Americans with Disabilities Act against Annucci, Sullivan, DOCCS, and OMH; (2) disability discrimination, in violation of Section 504 of the Rehabilitation Act of 1973, against Annucci, Sullivan, DOCCS, and OMH; (3) violation of New York Correction Law §137, against OMH and all OMH employee defendants; **[A268-69]** and (4) negligent supervision and training, against OMH and all OMH employee defendants.

therefore had "a subjective intent to reduce [Suarez]'s risk of harm." *Id.* at *14 (citation modified). And as to each OMH defendant, the District Court held they had no "reason to believe [Suarez] was psychologically decompensating, notwithstanding their awareness of [his] mental illness and history," principally "because [Suarez] did not tell anyone at Downstate he was hearing voices." *Id.* at *15.

Suarez timely appealed.

## III.    DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Standard

"We review *de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 828 (2d Cir. 2025) (citation modified).

> A motion for summary judgment may properly be granted – and the grant of summary judgment may properly be affirmed – only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law. The function of the district court in considering the motion for summary judgment is not to resolve

34

disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.

*Lara-Grimaldi v. Cnty. of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (citation modified).

## 2. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Cruel and unusual punishments include "the unnecessary and wanton infliction of pain on a prisoner." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (citation modified). "To demonstrate an Eighth Amendment violation, a plaintiff must make two showings." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). First, there is an objective prong: that "the alleged punishment [was] 'objectively, sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Our precedents establish that objectively serious punishment includes, among other things, conditions of confinement that "pose an unreasonable risk of serious damage to . . . health," *Vega v. Semple*, 963 F.3d 259, 273-74 (2d Cir. 2020), and "deprivation of adequate medical care," including "mental health care," *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Second, there is a subjective prong: that "the prison official involved must have acted with a 'sufficiently culpable

35

state of mind.'" *McPherson*, 174 F.3d at 280 (quoting *Farmer*, 511 U.S. at 834). We

have characterized the subjective prong as "a *mens rea* prong" or "mental element

prong," which requires a "showing that the officer acted with at least deliberate

indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d

Cir. 2017).

Although they are necessarily factually intertwined, we evaluate Suarez's

two Eighth Amendment claims – based on conditions of confinement and

inadequate medical care – separately. *See Goode v. Cook*, No. 23-7521-pr, 2025 WL

816302, at *4 (2d Cir. Mar. 14, 2025) (summary order) ("While a medical needs

claim and conditions of confinement claim are surely related, the Supreme Court

and our Court have treated them as distinct rights."); *McFadden v. Noeth*, 827 F.

App'x 20, 27 (2d Cir. 2020) (summary order). "To state a claim under the Eighth

Amendment on the basis that a defendant has failed to prevent harm" by

subjecting a plaintiff to unlawful conditions of confinement, "a plaintiff must

plead both (a) conditions of confinement that objectively pose an unreasonable

risk of serious harm to their current or future health, and (b) that the defendant

acted with deliberate indifference." *Vega*, 963 F.3d at 273 (citation modified).

And to make out an Eighth Amendment claim for deliberate indifference to

serious medical needs,[11] a plaintiff must show first that "the deprivation alleged

[was] objectively[] sufficiently serious" and that the defendant's "state of mind is

one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S.

at 834 (citation modified).

Although the two claims are distinct, both require Suarez ultimately to

prove that the defendant was deliberately indifferent to the objectively serious

risk to health posed by conditions of confinement or inadequate medical care.

"Deliberate indifference under the Eighth Amendment standard means the

official must" (1) "know of . . . an excessive risk to inmate health or safety" and

(2) "disregard" that risk. *Vega*, 963 F.3d at 273 (citation modified).

The standard for evaluating a prison official's knowledge is well-

established under our precedent. An official "knows of" an excessive risk to

inmate health or safety when he is "aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he . . . draw[s]

the inference." *Id.* The Supreme Court has described the requisite mental state

as "the equivalent of recklessly disregarding [a] risk." *Farmer*, 511 U.S. at 836.

---

[11] Of course, it is well-established that "psychiatric or mental health care is an integral part of medical care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989). It therefore "must be provided to prisoners." *Id.*

Thus, the standard requires more than mere negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Lara-Grimaldi*, 132 F.4th at 631 (citation modified); *see also Spavone*, 719 F.3d at 138 ("Officials need . . . not intend harm" to be deliberately indifferent.). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (per curiam) (citation modified).

To defeat a defendant's motion for summary judgment on the question of knowledge, a plaintiff need only point to a *genuine dispute of fact* as to whether that defendant knew of a risk. Thus, we have explained that summary judgment is improper where, on the one hand, "[a] jury could well find that the defendants rejected the requests to treat plaintiff . . . not because the defendants were in any way indifferent to plaintiff's needs, but because the defendants sincerely and honestly believed that they were required to comply" with certain policies, but, on the other hand, "a jury could also reasonably reach the contrary result,

38

namely, that the defendants here *did* subjectively know of, and disregard an excessive risk to, plaintiff's health," particularly where the record gives rise to disputes of fact as to knowledge and disregard. *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005). Where a jury could reach either conclusion, summary judgment is inappropriate because there remains "a question of fact that ought to be submitted to a jury." *Id.*

In addition to knowledge, a deliberate indifference claim requires a showing that a defendant "disregarded" a known risk. It is well-settled that one may disregard a risk – and thus be deliberately indifferent to it – through either action *or* inaction. *See Lara-Grimaldi*, 132 F.4th at 630; *see also Spavone*, 719 F.3d at 138 ("[T]he charged official must act or fail to act." (citation modified)). We have held, for example, that a defendant can be deliberately indifferent where he "knew of the health dangers and yet refused to remedy the situation, constituting deliberate indifference." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). "[A] deliberate indifference [to medical needs] claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson*, 412 F.3d at 404. Relatedly, liability may be imposed on prison staff who "discontinue[] various, significant medical treatments" that an

39

inmate was receiving before arrival at the facility, "ignoring the recommendations of his prior physician." *Abreu v. Lipka*, 778 F. App'x 28, 32 (2d Cir. 2019) (summary order).

Even where a defendant does not outright refuse to remedy a risk, he may exhibit deliberate indifference to a medical need by "consciously choos[ing] an easier and less efficacious treatment plan," *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (citation modified), or by "intentionally denying or delaying access to medical care," *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021). And, as particularly relevant here, deliberate indifference may be established where an inmate was "confined to SHU despite the recommendation that he be placed in a less-restrictive location," and kept there, even when officials knew of "the deleterious effect that his extended confinement in SHU-like conditions" would have "on his preexisting mental state." *Randle v. Alexander*, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013); *accord Palakovic v. Wetzel*, 854 F.3d 219, 229 (3d Cir. 2017) (plaintiff stated claim of deliberate indifference to serious medical needs against defendants who "permitted" him to be placed in solitary confinement despite "fragile mental health condition and history of self-harm and suicide attempts").

Inherent in our precedent is the principle that a defendant cannot have

disregarded a serious risk to a plaintiff, of which he was aware, if he did not have the ability to take some action to alleviate that risk.  This principle is reflected in our broader Section 1983 caselaw.  To bring a Section 1983 claim, a plaintiff must allege a specific defendant's "personal involvement . . . in alleged constitutional deprivations."  *Darby*, 14 F.4th at 130 (citation modified).  And to establish supervisory liability, a plaintiff must "establish the personal involvement of a supervisory defendant in the alleged constitutional deprivations of her subordinates," *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (citation modified), which may be based on a showing that the supervisor was "directly involved in the incident itself" or "failed to remedy a wrong after learning of" that wrong,  *M.B v. Reyes*, No. 97-2653, 1999 WL 147031, at *2 (2d Cir. Mar. 15, 1999) (summary order).

Applying these principles, we have affirmed a grant of summary judgment to defendant correction officers on a plaintiff's claim for denial of treatment where there was "no evidence that [the non-medical defendants] had the authority to intervene in an admittedly medical decision.  . . .  Nor on the undisputed facts could either [defendant] have prescribed [the] treatments for [the plaintiff], no matter how attentive to her problems and symptoms they

41

were." *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000). And even where a

defendant *was* a medical professional, we have held that he could not have been

deliberately indifferent where "he had no responsibility for the treatment" of the

plaintiff. *Id.*; *see also Acosta v. Thomas*, 837 F. App'x 32, 36 (2d Cir. 2020)

(summary order) (holding that defendant did not "fail[] to act" for Eighth

Amendment purposes where, among other things, he "never examined or

diagnosed [the plaintiff] . . .[,] did not make medical decisions as to the

appropriate treatments for individual inmates or resolve disputes between

inmates and their doctors").

As we have stated in a nonprecedential decision, "to be entitled to a jury

trial, [the plaintiff] must proffer evidence from which a reasonable juror could

infer that (1) [the defendant] was subjectively aware of the seriousness of [the

plaintiff's] situation, and (2) [that defendant] had the ability to take some action

that would have significantly alleviated" the risk. *Shepherd v. Hogan*, 181 F.

App'x 93, 96 (2d Cir. 2006) (summary order). We embrace that principle here:

liability for deliberate indifference under the Eighth Amendment requires a

showing that the defendant had some ability to mitigate the serious risk to a

plaintiff's health or safety. *See Clark v. Valletta*, 157 F.4th 201, 225 (2d Cir. 2025)

42

(Robinson, *J.*, concurring in part, dissenting in part) ("[P]laintiffs must allege (1) a serious medical need, and (2) that prison officials who were both aware of that need and capable of addressing it did not do so.").

On appeal, defendants do not dispute the objective prong of either the conditions of confinement or medical needs claims. The objective prong was likewise not disputed in the District Court, and therefore not adjudicated at summary judgment. *See Suarez*, 2024 WL 814664, at *12 n.13. And because the District Court concluded that defendants were entitled to summary judgment on the merits, it did not consider whether defendants were entitled to qualified immunity. *See id.* at *18 n.20. We therefore evaluate only whether there are genuine disputes of material fact as to whether each defendant acted with deliberate indifference to Suarez's (1) conditions of confinement or (2) serious medical needs. We conclude that there are. We address Suarez's claims against each defendant in turn.

## B. DOCCS Defendants

In granting summary judgment, the District Court concluded, as a matter of law, that the DOCCS defendants – Horan and Morton – subjectively believed that Suarez did not face a serious risk of harm through conditions of confinement

43

or inadequate medical care.  *See id.*, 2024 WL 814664, at *13-14.  But that was insufficient to support a grant of summary judgment in their favor.  As explained above, at summary judgment, Suarez need only point to evidence – including circumstantial evidence – from which a jury *could* infer that "a substantial risk of serious harm exist[ed]" and that the defendant recklessly disregarded that risk through affirmative acts, inaction, or inadequate action.  *Farmer*, 511 U.S. at 837; *see also Phelps*, 308 F.3d at 186.  Even if the record also permits the inference that "the defendants sincerely and honestly believed that" their actions were adequate, or that no action was required, it is the jury, and not the court, that must resolve the competing inferences.  *Johnson*, 412 F.3d at 404.

Thus, defendants' argument that "[t]here is no basis in the record to conclude that any of the defendants *intentionally* delayed or denied Suarez medical care or ignored a significant risk that his condition would deteriorate without additional treatment," Defendants-Appellees' Br. at 24 (emphasis added), misses the mark.  The relevant standard for deliberate indifference is *recklessness*.  "Officials need only be aware of the risk of harm, not intend harm" to be deliberately indifferent under the Eighth Amendment.  *Spavone*, 719 F.3d at 138.

44

### 1.    Defendant Horan

Suarez argues that the District Court erred by concluding that Horan, the SORC assigned to conduct Suarez's Tier 3 disciplinary hearing, could not have been deliberately indifferent because the evidence conclusively established (1) that Horan had "a subjective intent to reduce [Suarez's] risk of harm" by removing him from the SHU after the disciplinary hearing, and (2) that Horan had a "subjective belief that [Suarez] was not at a serious risk of harm in SHU during the disciplinary hearing." *Suarez*, 2024 WL 814664, at *14.  We conclude that genuine disputes of material fact prevent summary judgment in favor of Horan.

### a.    Conditions of Confinement

First, we conclude that there are genuine disputes regarding whether Horan knew of "an excessive risk to [Suarez's] health or safety" posed by his placement in disciplinary housing and "disregarded that risk." *Vega*, 963 F.3d at 273-74.

Horan, as the assigned SORC, reviewed Suarez's hearing packet, which described his SMI status and the basis for it.  Horan testified that during the hearing, Suarez seemed "a little bit off" and "appeared to lack connection and

was clearly not completely free of any signs of mental illness." App'x at 1893, 2018 (citation modified). Indeed, Horan adjourned the hearing in response to Suarez's representation that he was unfamiliar with OMH and did not understand the nature of his disciplinary proceeding in order to obtain confidential testimony from DiNardo, the SHU clinician, during which DiNardo opined that Suarez "is not suitable for confinement in disciplinary housing due to the mental illness." App'x at 1166. Because Horan personally observed Suarez's behavior at the hearing and heard DiNardo's opinion that Suarez was not suitable for disciplinary housing, a jury could reasonably conclude that Horan knew of the risk that continued disciplinary housing would have a negative impact on Suarez's mental health.

The record also permits an inference that Horan disregarded that risk. As SORC, Horan had the power to remove Suarez from disciplinary confinement prior to the start of the hearing and the authority to impose a disciplinary sentence at the conclusion of the hearing. Despite his ability to alleviate the danger to Suarez, Horan did not remove Suarez from the SHU prior to the start of the disciplinary hearing. And even after DiNardo testified that Suarez was not suitable for disciplinary housing – testimony that Horan admitted should be

46

given "considerable" weight – Horan imposed an *above*-DOCCS guidelines

sanction on Suarez of 60 days in keeplock, with 30 of those days deferred. App'x

at 2015, 2020. While Horan testified that he "wanted [Suarez] out of [the] SHU as

quickly as possible," App'x at 1092, it is undisputed that keeplock, even when

served in the general population, is a form of disciplinary housing in which an

inmate is confined to his cell for 23 hours per day. Indeed, Horan acknowledged

that keeplock is a "confined setting." App'x at 2021. Drawing inferences in

Suarez's favor, as is required at the summary judgment stage, a reasonable jury

could conclude that Horan was deliberately indifferent because he knew of

Suarez's serious mental illness and witnessed signs of decompensation, and yet

affirmatively sanctioned Suarez to an additional term of disciplinary housing

despite testimony from medical professionals that it was not appropriate. *See*

*LaBounty*, 137 F.3d at 73 (defendant was deliberately indifferent where he "knew

of the health dangers and yet refused to remedy the situation"). The District

Court erred in holding to the contrary.

### b. Medical Needs

Whether there are genuine issues as to Horan's deliberate indifference to

Suarez's medical needs is a closer call. Ultimately, we conclude that Suarez has

sufficiently raised triable questions of fact that must be resolved by a jury.

There is evidence that Horan had knowledge of the serious risk posed to Suarez's health by inadequate medical treatment and placement in disciplinary housing. It is true that DiNardo testified at the disciplinary hearing: "No matter the length of the sanction given, Mental Health will continue to monitor the inmate patient closely and make referrals for special programming when available." App'x at 1166. But DiNardo *also* testified that "[a]t the time of the incident, [Suarez] was prescribed Zyprexa . . . which was discontinued due to his noncompliance with same," and that "the conduct related to the disciplinary hearing is related to the inmate patient's mental health symptoms." App'x at 1165-66. And, as previously noted, DiNardo testified that Suarez "is not suitable for confinement in disciplinary housing due to the mental illness." App'x at 1166. On balance, while a jury could conclude that Horan reasonably believed OMH staff would address any medication and treatment needs, this record would also permit an inference that Horan knew that Suarez was not being medicated and was exhibiting symptoms of psychosis, which led to an altercation with DOCCS staff, and that someone with his mental health profile should not be subject to segregated housing or keeplock status. The jury is

48

entitled to weigh that competing evidence.

There are likewise genuine disputes as to whether Horan disregarded the known risk posed by inadequate medical treatment. Horan had the authority to refer Suarez to OMH for further mental health treatment; although he testified that "OMH was involved with every mental hygiene case" by 2017, he conceded that he still retained the ability to make such a referral and that he had done so in the past. App'x at 1078, 2026. Despite his power to do so, Horan failed to refer Suarez for further treatment and instead imposed a keeplock sanction on Suarez that exceeded DOCCS guidelines, despite hearing testimony that Suarez should not be kept in disciplinary housing. Drawing inferences in Suarez's favor, as we must, we conclude that a reasonable jury could find that Horan was deliberately indifferent because he knew of Suarez's serious mental illness and that he was not taking medication, and personally witnessed signs of decompensation, yet failed to refer Suarez for further treatment. We conclude that genuine disputes of material fact exist sufficient to permit Suarez's deliberate indifference to serious medical needs claim against Horan to proceed to trial.

### 2. Defendant Morton

Suarez contends that there are genuine disputes of material fact as to

49

whether Morton, as Superintendent of Downstate, knew of Suarez's serious mental health condition and the risk of decompensation but disregarded that risk by failing to remove him from disciplinary housing or refer him for further medical treatment. We agree.

### a. Conditions of Confinement

We begin first with Suarez's conditions of confinement claim against Morton – specifically, whether Morton knew of the risk to Suarez's health posed by subjecting him to "unlawful conditions of confinement" and consciously disregarded that risk. *Vega*, 963 F.3d at 273.

There is ample record evidence from which a jury could infer that Morton knew of the risk that placement in disciplinary housing posed to Suarez's mental health. Morton signed the Unusual Incident Report regarding Suarez's altercation with DOCCS staff, which noted, among other things, that Suarez was "acting unpredictable" and had spit at DOCCS staff, which prompted his placement in the SHU. App'x at 1739-40. Morton himself made weekly rounds of the SHU, speaking with individuals housed there – including, presumably, Suarez, who spent fifteen days in the SHU, during which time he experienced hallucinations. And Morton personally reviewed and signed off on

50

recommendations of the JCMC, which was responsible for reviewing, monitoring, and coordinating treatment plans for inmates in the SHU who were assigned to OMH's caseload, including Suarez. The parties dispute whether the JCMC met on August 17, 2017, while Suarez was in the SHU; whether that meeting occurred and whether Suarez's condition was discussed is a question of fact for the jury. If the meeting in fact occurred, it could be reasonably inferred that Morton knew of Suarez's condition, that he was not taking medication, and that the SHU was detrimental to his health. Moreover, although the parties dispute whether Morton signed the initial deprivation order on August 8, 2015, when Suarez was placed in the SHU, it is undisputed that Morton discontinued that order after seven days, on August 15, 2015. Based on his discontinuation order, a jury could readily infer that Morton knew the risk posed to Suarez by 24-hour confinement, to which Suarez had been subjected for seven days.

The record also reflects that Morton was confronted by superiors about the risk that disciplinary confinement posed to Suarez. After Morton signed off on Horan's above-DOCCS-guidelines sanction of 60 days in keeplock, Morton received an email from DOCCS Acting Assistant Commissioner Finnegan, which expressly flagged that Morton's "review still leaves the confinement sanction

51

OVER the guidelines" applicable to individuals with SMI status. App'x at 918; *see also* App'x at 2028. The record thus permits the inference that Morton was aware of the danger posed to Suarez by continued confinement in disciplinary housing.

There are also genuine issues of fact as to whether Morton was deliberately indifferent to Suarez's health by "refus[ing] to remedy" the dangerous situation. *LaBounty*, 137 F.3d at 73.

First, Morton had the power as Superintendent to alleviate the risk posed to Suarez's health by disciplinary housing. He testified that he could release inmates from the SHU while a Tier III disciplinary hearing was underway – though he chose not to in this case. And Suarez's disciplinary hearing resumed – and mental-health testimony was taken – on the same day (August 21, 2017) that Morton submitted the AOT petition in which he acknowledged that Suarez had a "significant history of mental health problems" and "non-compliance with treatment." App'x at 1261, 1263. In light of that evidence, the jury could infer that by refusing to remove Suarez from the SHU, Morton consciously disregarded a serious risk of which he was aware.

Morton also reviewed, signed off on, and had the authority to modify the

keeplock sanction imposed by Horan. But despite submitting an AOT petition raising serious concerns about Suarez's health, and despite receiving an email from the Acting Assistant Commissioner flagging that the sanction was excessive, there is no evidence that Morton removed Suarez from keeplock or diverted him to the FDU. In the face of Morton's ability to remedy Suarez's conditions of confinement, a reasonable jury could conclude that his failure to do so constitutes deliberate indifference.

In granting summary judgment, the District Court concluded that "[n]o reasonable juror would find that [Morton] was deliberate[ly] indifferen[t]" because Morton "acted to protect [Suarez] from harm" when he "declin[ed] to renew [Suarez]'s deprivation order at the first opportunity." *Suarez*, 2024 WL 814664, at \*13. While the inference drawn by the District Court may be a permissible one, as stated above, the record evidence also permits an inference that he should have acted sooner. How to weigh the competing evidence is squarely within the province of the jury. *See Lara-Grimaldi*, 132 F.4th at 633.

#### b.    Medical Needs

Genuine disputes of material fact likewise preclude summary judgment on Suarez's deliberate indifference to medical needs claim against Morton.

53

The record supports an inference that Morton knew Suarez was not taking his medication, knew of the risks that inadequate medication and disciplinary confinement posed to Suarez's mental health, and knew that Suarez was in fact decompensating. Morton signed the Unusual Incident Report, which noted Suarez's unpredictable behavior, *see* App'x at 1739-40; Morton made weekly rounds of the SHU while Suarez was housed there, during the time that, according to Suarez's testimony, he began hallucinating and having anxiety attacks, *see* App'x at 383, 1970; and Morton was on the JCMC, which reviewed medical records and treatment plans of SMI inmates, including Suarez, *see* App'x at 1968-69. Moreover, drawing all inferences in Suarez's favor, a factfinder could find that the JCMC did meet on August 17, 2017, while Suarez was in the SHU, and discussed Suarez's condition. Taken together, these facts would permit a reasonable jury to conclude that Morton knew that Suarez was not taking medication, knew of the risk that lack of medication and disciplinary confinement posed to Suarez's health, and knew that Suarez was decompensating.

Perhaps most significantly, on August 21, 2017, while Suarez was still in the SHU, Morton submitted an AOT petition on his behalf, in which he expressly

attested that Suarez's "history of lack of compliance with treatment for mental illness . . . resulted in one or more acts of serious violent behavior," that Suarez "has a significant history of mental health problems . . . and hospitalization related to mental illness, substance abuse, and non-compliance with treatment," and that Suarez had "continued lack of insight into his mental illness and the need for treatment." App'x at 1260-61. Indeed, without an AOT, Morton expressed his view that Suarez would not "change his pattern of treatment non-compliance with resultant psychosis and high risk behaviors." App'x at 1261. The jury could infer from this petition alone that Morton knew of Suarez's condition and the risk that lack of treatment posed. Morton's own words give rise to a triable issue of fact as to Morton's knowledge that Suarez faced serious mental health risks without proper treatment and that he was decompensating.

A jury could also conclude that Morton consciously disregarded the known risk posed by lack of medication and disciplinary housing. Morton, as a DOCCS employee, had the power to refer Suarez to OMH. Thus, not only could Morton remove Suarez from disciplinary housing, he could also take steps to obtain further mental health treatment for Suarez. His choice not to do so – despite knowing that Suarez was unmedicated and that placement in

55

disciplinary confinement was a risk to his health and knowing, as demonstrated

by the AOT petition, that Suarez needed treatment – creates a genuine dispute of

material fact as to his deliberate indifference.  We conclude that the District

Court's holding that Morton "acted to protect [Suarez] from harm" as a matter of

law when he sought "an AOT order that would mandate continued mental

health treatment upon [Suarez]'s release," *Suarez*, 2024 WL 814664, at *13,

impermissibly resolved disputed facts in Morton's favor.  There are sufficient

disputes of material fact to preclude summary judgment in favor of Morton.

### C.    OMH Defendants

Defendants contend that "[t]hough Suarez occasionally showed symptoms

of his mental illness," none of the OMH providers – Kulick, DiNardo, Qayyum,

Reynolds, and Baker – "subjectively believed that Suarez was at significant risk

of imminently or rapidly decompensating" such that they "were deliberately

indifferent to Suarez's need for psychotropic medication to prevent

decompensation," and that "no reasonable juror could conclude that Suarez's

treatment providers believed Suarez needed to be removed from disciplinary

housing."  Defendants-Appellees' Br. at 2-3, 24-25.  We are not persuaded.  *See*

*Johnson*, 412 F.3d at 404 (concluding summary judgment was improper where

56

record permitted inference that defendants knew and disregarded a risk, even where record also permitted competing inference that defendants sincerely and honestly believed that their actions adequately addressed the risk).

Underlying our analysis as to each OMH defendant is the following undisputed fact: "If at any time an OMH employee believes that the incarcerated individual requires immediate mental health treatment, that staff member can place the incarcerated individual in the FDU regardless of when the hearing is to be conducted or the sanction imposed." App'x at 711. Thus, each OMH defendant indisputably had the authority to place Suarez in the FDU at any time. *Cf. Cuoco*, 222 F.3d at 111 (noting lack of evidence demonstrating certain defendants had "authority to intervene"); *see also Shepherd*, 181 F. App'x at 96. And, again, the OMH defendants need not have been *intentionally* indifferent to risks posed to Suarez's health, *see Spavone*, 719 F.3d at 138; the question is whether the record permits an inference that each defendant *recklessly disregarded* those risks.

### 1. Defendant Kulick

There are genuine disputes of material fact as to whether Defendant Kulick – Suarez's OMH primary clinician during his time at Downstate when he was

not housed in the SHU – knew of risks to Suarez's health posed by disciplinary housing and lack of medication and knew that he was in fact decompensating, and yet consciously disregarded those risks.

### a. Conditions of Confinement

The record permits an inference that Kulick, as Suarez's primary clinician, knew of the risks posed to his mental health by disciplinary housing. Kulick conducted Suarez's intake evaluation, during which she detailed Suarez's medical history. That medical history included Suarez's Zyprexa prescription, which was active upon his arrival at Downstate, as well as his history of mood swings, auditory hallucinations, and previous suicide attempt. Based on this history, it was Kulick who recommended that Suarez be designated as a Level 1-S and that he be admitted to OMH care for individual therapy and medication. Kulick's initial review also recommended that if the treatment team observed signs of "suicidality and psychiatric decompensation," then Suarez "may benefit from a medication evaluation and/or [residential crisis treatment program] admission." App'x at 1440. She also identified "disciplinary sanctions" and "single [c]ell" housing as potential "[r]isk factors." App'x at 1440. This evidence precludes a finding, as a matter of law, that Kulick lacked knowledge of the risk

58

that disciplinary housing posed to Suarez.

The record likewise reflects a genuine dispute as to whether Kulick knew that Suarez was in fact decompensating.  Kulick testified in her deposition that she was aware that between June 30, 2017, and July 19, 2017, Suarez "did not want to take the medication anymore and the psychiatrist [Qayyum] had discontinued it."  App'x at 816.  A few weeks later, on August 8, 2017, Kulick responded to a request from the infirmary for an immediate mental health referral after Suarez's altercation with DOCCS staff.  Shortly before Kulick's arrival, Suarez was unaware of the current date.  When Kulick arrived, she observed Suarez wearing a spit mask.  While Kulick described Suarez as having a neutral mood and an affect within the normal range – evidence that the District Court credited in granting summary judgment – Kulick's notes also reflected that Suarez's "eye contact [was] sporadic" and that she "suspected that he may be under the influence."  App'x at 502.  Crediting this evidence, a jury could conclude that Kulick knew Suarez was experiencing serious mental health issues and could be decompensating.

Kulick's recommendation that Suarez should be admitted to a residential crisis treatment program if he started to decompensate, her acknowledgment

59

that disciplinary sanctions and single-cell housing were risk factors for him, and her observations of him after the immediate referral, taken together, are sufficient to permit a reasonable jury to infer that Kulick was deliberately indifferent to Suarez's serious medical needs by failing to divert him from disciplinary housing. It is undisputed that any OMH employee – Kulick included – could place an individual in the FDU at any time, regardless of where the individual was housed and whether there was a disciplinary proceeding underway. Accordingly, when Kulick – who was particularly familiar with Suarez's medical history and the fact that he had been unmedicated for around five weeks – was called to the infirmary after Suarez's altercation with DOCCS officers, saw Suarez in a spit mask, noted his sporadic eye movements, and suspected that he was under the influence, her failure to divert him to the FDU or take any other action to address his condition could suffice to establish that she was deliberately indifferent to the risk posed by Suarez's conditions of confinement.

### b.     Medical Needs

Disputes of fact likewise prevent summary judgment in favor of Kulick on Suarez's deliberate indifference to medical needs claim. First, knowledge: As discussed, Kulick was familiar with Suarez's medical history, including mood

60

swings, auditory hallucinations, and a previous suicide attempt, and she was aware that he arrived to Downstate with an active Zyprexa prescription. Moreover, Kulick herself recommended Suarez's admission to OMH for therapy and medication. And, as noted, the evidence permits an inference that Kulick knew Suarez was in fact decompensating.

It is true that Suarez denied on July 19, 2017, and August 8, 2017, that he was experiencing psychiatric symptoms, specifically hallucinations. But Kulick is a mental health professional; those denials are insufficient to establish as a matter of law that Kulick lacked knowledge that Suarez was decompensating and needed treatment. Kulick herself acknowledged that "a seriously mentally ill individual may not accurately self-report their symptoms if that person is not compliant in taking their prescribed psychiatric medication." App'x at 1986. Drawing inferences in Suarez's favor, a reasonable jury could conclude that Kulick recognized that Suarez would decompensate without medication, knew his medication had been discontinued, and witnessed signs of decompensation.

There are also disputed factual issues as to whether Kulick disregarded the risk Suarez faced from inadequate medical treatment and disciplinary confinement. Kulick, as Suarez's primary care clinician from June 22, 2017, until

August 8, 2017, certainly had the power to seek further mental health treatment for him. In her role, Kulick prepared Suarez's treatment plan and examined him on a monthly basis. After the August 8, 2017, altercation with correctional officers, Kulick responded to an infirmary referral and made notes indicating that she knew Suarez was no longer on medication. *See* App'x at 972. A jury could reasonably infer that Kulick had the ability to recommend treatment, even if she could not write prescriptions – particularly after she learned that Qayyum had discontinued Zyprexa. And, as discussed, Kulick had the authority to send Suarez to the FDU at any time including when he was in the SHU or serving a keeplock sanction. Accordingly, just as with the conditions of confinement claim, a jury could infer that, when Kulick – who was intimately familiar with Suarez's medical history and the fact that he had been unmedicated for around five weeks – was called to the infirmary after Suarez's altercation with DOCCS officers, saw Suarez in a spit mask, noted his sporadic eye movements, and suspected that he was under the influence, her failure to divert Suarez to the FDU or take any other action with regard to his medical needs constituted deliberate indifference.

The District Court therefore erred in granting summary judgment in favor of Kulick.

## 2. Defendant DiNardo

The record gives rise to genuine disputes of material fact as to whether Defendant DiNardo, the SHU clinician responsible for Suarez's care while he was housed there, was subjectively aware of the severity of Suarez's mental illness, that he was decompensating without medication, and that his housing in the SHU and lack of medication posed a serious risk to his health. There likewise are disputed factual issues regarding whether, in spite of that knowledge, DiNardo disregarded the risks posed to Suarez by the conditions of confinement and lack of medical treatment.

### a. Conditions of Confinement

The record contains ample evidence from which a jury could infer that DiNardo knew of the risk disciplinary confinement posed to Suarez's health and that Suarez was in fact decompensating. DiNardo, Suarez's primary clinician upon his entry in the SHU, made daily weekday rounds to observe the inmates in the SHU, including Suarez. Suarez testified that during that time, he began experiencing hallucinations and anxiety attacks. Although it is undisputed that Suarez did not expressly tell DiNardo that he was experiencing hallucinations, DiNardo testified in her deposition that she knew that "placement in [the] SHU

can cause a person to decompensate," App'x at 416, and she testified at Suarez's disciplinary proceeding that it was her medical opinion that the DOCCS altercation resulted from Suarez's mental illness. Specifically, she observed that his behaviors, including "mood fluctuation and psychosis" were "consistent with his current diagnosis." App'x at 1165. She also testified that Suarez had been discontinued from Zyprexa due to noncompliance, and she opined that he was "not suitable for confinement in disciplinary housing due to the mental illness." App'x at 1165-66. Additionally, DiNardo served on the JCMC, which reviewed the files and treatment plans of individuals housed in the SHU – including Suarez. Assuming that the JCMC met while Suarez was housed in the SHU, the committee members would have discussed Suarez's mental health and whether to remove him from the SHU.

There is likewise a dispute of material fact as to whether DiNardo disregarded the risk posed by disciplinary confinement. DiNardo, as an OMH employee, had the capability to remove Suarez from the SHU and send him to the FDU, even during the pendency of his disciplinary hearing. And as Suarez's primary clinician, DiNardo was principally responsible for his mental health treatment while he was in the SHU. DiNardo testified at the disciplinary hearing

that Suarez "did not display any symptoms relating to his mental illness" during her rounds or "advise [her] of any concerns," App'x at 414, and her treatment notes from August 22, 2017, reported no signs of psychiatric decompensation. But DiNardo knew that disciplinary confinement could lead to decompensation and testified that Suarez specifically was not suited for disciplinary housing and that his behavior was consistent with the absence of anti-psychotic medication. The jury is entitled to weigh this competing evidence and find that DiNardo was deliberately indifferent to Suarez's serious medical needs by failing to remedy the risk posed by the conditions of confinement in disciplinary housing.

### b. Medical Needs

Disputed issues of fact likewise preclude summary judgment on Suarez's deliberate indifference to serious medical needs claim against DiNardo. As discussed, the record evidence supports a conclusion that DiNardo knew that Suarez was decompensating and that the decompensation was exacerbated by disciplinary housing and lack of medication. Indeed, DiNardo testified at Suarez's disciplinary hearing about Suarez's mental illness and that he was not suited for disciplinary housing. *See* App'x at 1165-66. And, as mentioned, drawing inferences in Suarez's favor that the JCMC met and reviewed Suarez's

file on August 17, 2017, while he was in the SHU, DiNardo would have discussed Suarez's mental health status and his disciplinary sanction. Accordingly, a jury could infer that DiNardo knew of the serious risk that Suarez was decompensating without medication while housed in the SHU.

On this record, a jury could also conclude that DiNardo consciously disregarded Suarez's serious medical needs. As mentioned, DiNardo had the capability to divert Suarez to the FDU for further mental health treatment while he was under her care. And as Suarez's primary clinician, DiNardo was principally responsible for his mental health treatment while he was in the SHU.

The record reflects genuine disputes of material fact as to whether DiNardo was deliberately indifferent to Suarez's medical needs, in spite of the measures she claimed she did take. While DiNardo testified that she would "say hi" to Suarez through his cell door during rounds, Suarez testified that he did not receive treatment while in the SHU. Even crediting DiNardo's testimony of her daily check-ins on Suarez, which we need not do at the summary judgment stage, a jury could find that level of care constitutionally inadequate. This is particularly so because New York law mandated that "[i]nmates with serious mental illness who are not diverted or removed from segregated confinement

shall be offered a heightened level of care, involving a minimum of two hours each day, five days a week, of out-of-cell therapeutic treatment and programming," unless a contrary recommendation is made and documented. N.Y. Correct. Law §137(6)(d)(iii) (effective until Dec. 17, 2017).

Moreover, as noted, DiNardo's failure to exercise her authority to divert Suarez to the SHU supports Suarez's deliberate indifference to serious medical needs claim. Although DiNardo stated in progress notes and at Suarez's disciplinary hearing that Suarez did not exhibit or tell her about his mental health symptoms, she also testified that Suarez was not suited for disciplinary housing and that his behavior was consistent with unmedicated psychosis. In light of DiNardo's failure to send Suarez to the FDU or otherwise treat him in accordance with the level of care mandated by Downstate policy and New York law, the record does not support a finding, as a matter of law, that DiNardo was not deliberately indifferent to Suarez's serious medical needs.

### 3. Defendant Qayyum

As with the other OMH defendants, disputed issues of fact preclude summary judgment on Suarez's claims against Defendant Qayyum, Suarez's psychiatrist at Downstate.

67

### a.  Conditions of Confinement

The evidence is sufficient to permit an inference that Qayyum knew of the substantial risk posed to Suarez's mental health by placement in disciplinary housing.  From the beginning of Suarez's time at Downstate, Qayyum was familiar with his medical history, including his history of hallucinations and his Zyprexa prescription.  As Suarez's primary psychiatrist, Qayyum was responsible for formulating a treatment plan and working with Suarez's primary clinician, Kulick, to prepare Suarez's Core History form and other intake paperwork.  That paperwork expressly noted that OMH should monitor Suarez for signs of "suicidality and psychiatric decompensation," observed that he "may benefit from a medication evaluation and/or [residential crisis treatment program] admission," and that "disciplinary sanctions" and "single [c]ell" housing posed a risk to Suarez.  App'x at 1440.  From this evidence, a reasonable jury could certainly infer that Qayyum knew of the risk posed to Suarez by disciplinary confinement.

A jury could also find that Qayyum was aware that Suarez was in fact decompensating.  Qayyum met with Suarez intermittently between June 30, 2017, and August 24, 2017 – both before he was serving any disciplinary sanction and

after he was released from the SHU but subject to a keeplock sanction. About a month after Qayyum first terminated Suarez's prescription for Zyprexa, the two met again. While Suarez denied hallucinations, Qayyum noted that his mood and affect were "slightly blunted." App'x at 563. And when Qayyum met with Suarez on August 24, 2017, almost two months after he discontinued the Zyprexa prescription, and after Suarez had spent several weeks in the SHU, Qayyum reported that Suarez was "coherent" but "laughing inappropriately," despite Suarez's continued denial of hallucinations. App'x at 565. While the District Court recognized that Qayyum observed inappropriate laughter, it held that the record established, as a matter of law, that Qayyum lacked knowledge that Suarez was decompensating because Suarez denied hallucinations and exhibited fair insight and judgment. *See Suarez*, 2024 WL 814664, at *15. That conclusion impermissibly weighed the evidence in Qayyum's favor. We conclude that there are genuine disputes of material fact precluding a finding that Qayyum lacked knowledge of Suarez's condition.

There are also genuine disputes of material fact that preclude summary judgment as to whether Qayyum was deliberately indifferent to the risk posed by Suarez's conditions of confinement. Like other OMH staff members, Qayyum

69

had the authority to send Suarez to the FDU for further mental health treatment at any time, including when Suarez was in the SHU or keeplock confinement. His failure to do so, despite being aware that Suarez was likely to decompensate without medication and that disciplinary sanctions and single-cell housing were documented risk factors to Suarez, and despite observing signs of decompensation (including inappropriate smiling and laughter) after Suarez had been off Zyprexa for almost two months and in disciplinary housing for over two weeks, permits an inference that Qayyum acted with deliberate indifference to the risk posed by Suarez's conditions of confinement.

### b.    Medical Needs

The evidence is even stronger in support of Suarez's claim that Qayyum was deliberately indifferent to his serious medical needs.

Qayyum was Suarez's primary psychiatrist at Downstate and met with him on several occasions. In this capacity, Qayyum was responsible for prescribing psychiatric medication and providing medication counseling and education to Suarez. Qayyum was also uniquely familiar with Suarez's medical history and his Zyprexa prescription. In response to Suarez's claim that he did not need medication, Qayyum discontinued Zyprexa and recommended

70

continued individual therapy; he did this even though he knew full well that some individuals with mental illness "believe they do not need medication, but once they stop taking it they begin to decompensate." App'x at 445-46. This alone might be sufficient to support an inference of knowledge of the risk posed to Suarez by lack of medication. But then, on August 11, 2017, Qayyum received the Kirby Discharge Summary, which specifically noted Suarez's hospitalizations due to treatment noncompliance and indicated that Downstate should "encourage medication compliance as [Suarez] will decompensate if non-compliant." App'x at 1448; App'x at 2001-02. Accordingly, a reasonable jury could readily conclude that, by August 11, 2017, at the latest, Qayyum knew that Suarez was at risk of decompensating without medication.

Moreover, for many of the reasons discussed above, the record supports an inference that Qayyum recognized signs that Suarez was in fact decompensating. One month after Suarez stopped taking Zyprexa, Qayyum observed Suarez's mood and affect as "slightly blunted." App'x at 563. Two months after Qayyum stopped Suarez's medication, Qayyum reported that Suarez was "coherent" but "laughing inappropriately." App'x at 565. Even crediting Qayyum's assertion that Suarez denied hallucinations, the evidence at minimum creates a genuine

dispute as to Qayyum's knowledge that Suarez was experiencing serious symptoms of psychosis.

A jury could also find that Qayyum's failure to provide medical treatment or divert him from disciplinary confinement, in the face of Suarez's decompensation, constituted deliberate indifference to Suarez's serious medical needs. As stated, Qayyum was principally responsible for Suarez's medication management at Downstate, knew that doctors at Kirby warned that medication compliance was essential, knew that disciplinary housing was a risk factor for Suarez, and yet Qayyum discontinued the Zyprexa prescription and did not reinstate it or seek more aggressive care (by, for example, diverting him to the FDU) despite observing signs of decompensation while Suarez was in disciplinary confinement. And although Qayyum attested that he discussed Zyprexa with Suarez and the need for him to take medication, Suarez disputes that medication education was actually given. Instead, Suarez contends that Qayyum merely checked the "medication education provided" box on progress notes but did not actually provide any education. The fact that Qayyum left blank the narrative "comments" section about medication education on his progress notes supports Suarez's version of events.

Accordingly, we conclude that genuine disputes of material fact exist as to whether Qayyum was deliberately indifferent to Suarez's serious medical needs.

### 4. Defendant Reynolds

The record gives rise to genuine disputes of fact as to whether Reynolds, an OMH psychiatrist who assessed Suarez's eligibility for AOT, knew that Suarez was decompensating but failed to divert him from disciplinary housing or take steps to get him additional medical treatment.

### a. Conditions of Confinement

First, the record supports an inference that Reynolds knew of the risk posed to Suarez's health by disciplinary confinement and knew that Suarez was decompensating, yet failed to divert him to the FDU.

With respect to knowledge, Reynolds attested that AOT applies to those who require "mandatory treatment" due to "a history of noncompliance with treatment and have had multiple hospitalizations and/or have engaged in violence." App'x at 455. To evaluate Suarez's eligibility for an AOT order, Reynolds was required to exercise his "clinical judgment, based on a review of records, consulting with [Suarez's] treatment team, and" meeting with him. App'x at 456. While Reynolds claimed that he did not have a "basis to seek civil

73

commitment" of Suarez after his August 17, 2017, review, he in fact sought an AOT order after his August 25, 2017, meeting with Suarez. App'x at 456-57. The record establishes that Reynolds was aware of Suarez's history of mental illness, including the risk of decompensation without medication, that disciplinary sanctions and single-cell housing were risk factors for him, and that he had not been taking Zyprexa for over a month at the time of their first meeting.

There is also a genuine dispute of material fact as to Reynolds's knowledge that Suarez was in fact decompensating in disciplinary housing. Reynolds first met with Suarez while he was housed in the SHU, during his disciplinary hearing. At both that meeting and Reynolds's second meeting with Suarez on August 25, 2017, after Suarez had spent several weeks in disciplinary housing and was serving a keeplock sanction, Reynolds's notes indicated that Suarez had a mildly elevated affect and was inappropriately smiling and laughing. Although Suarez denied hearing voices, Reynolds noted that his insight was "poor." App'x at 504. While the District Court recognized that Reynolds observed Suarez's inappropriate smiling and laughter, it weighed that information against Reynolds's other observations that Suarez was "alert and properly oriented" and that he "denied experiencing hallucinations or homicidal

74

ideations" to hold that "the record does not raise an inference that [he] [was] subjectively aware [Suarez] was or would psychologically decompensate." *Suarez*, 2024 WL 814664, at *15. In so doing, the District Court improperly resolved disputed issues of fact in Reynolds's favor. *See Lara-Grimaldi*, 132 F.4th at 633.

There are also genuine disputes of fact as to whether Reynolds consciously disregarded the risk posed to Suarez by placement in disciplinary housing. Reynolds was an OMH employee who, like the others, had the authority to send Suarez to the FDU for further mental health treatment at any time, including when Suarez was in the SHU during the August 17, 2017, meeting and when he was in keeplock housing during the August 25, 2017, meeting. A reasonable jury could infer that Reynolds knew that Suarez was decompensating and that he consciously disregarded the risk to Suarez's health and well-being by failing to exercise his ability to remove Suarez from the SHU by referring him to the FDU. The District Court found that, as a matter of law, Reynolds did not disregard a risk to Suarez because he "advocated for [Suarez] to be issued the AOT order" and thus "took affirmative steps to protect [Suarez] from any harm his poor insight into his mental health condition posed after his release." *Suarez*, 2024 WL

814664, at *15.  But Suarez's claims are based on the conditions of his *confinement*, not his release, and it is undisputed that Reynolds did nothing to address those conditions.  The record is sufficient to preclude summary judgment in favor of Reynolds on this claim.

### b.    Medical Needs

The same evidence creates triable issues as to whether Reynolds knew of the risk posed to Suarez by disciplinary confinement and a lack of medication and consciously disregarded that risk.  The very fact that Reynolds assessed Suarez for AOT establishes his knowledge that Suarez was noncompliant with treatment, and that treatment was necessary for Suarez's own safety and the safety of others.  Reynolds's own affirmation seeking the AOT order stated that "[w]hen non-compliant with psychiatric treatment, [Suarez] experiences auditory hallucinations, mood lability, and suicidal ideation," and that Suarez "has a history of violence toward self and others."  App'x at 1265.  Reynolds also noted that "Suarez's Zyprexa medical had been discontinued approximately five weeks" before he assaulted and threatened to kill an officer at Downstate.  App'x at 1266.

In light of his authority to send Suarez to the FDU for further mental

health treatment at any time, a jury could reasonably infer that Reynolds consciously disregarded Suarez's serious medical needs by failing to divert him for further medical attention. The District Court's conclusion that, as a matter of law, Reynolds acted only to benefit Suarez overlooked material evidence to the contrary. Accordingly, Reynolds is not entitled to summary judgment on this claim.

### 5. Defendant Baker

Finally, there are genuine disputes of material fact as to whether Baker, an OMH social worker who coordinated Suarez's post-release mental health treatment, was deliberately indifferent to Suarez's conditions of confinement and medical needs.

### a. Conditions of Confinement

The record supports an inference that Baker knew that disciplinary housing posed a risk to Suarez's health. Baker began her pre-release work in July 2017 by requesting Suarez's records, which documented his medical history, including that disciplinary sanctions and single-cell housing were "[r]isk factors." App'x at 1440. A jury could also infer that Baker knew that Suarez was decompensating. Baker received an email from the OMH AOT Coordinator on

August 11, 2017, with Suarez's Discharge Plan from Kirby, which expressly

flagged Suarez's likelihood of decompensating without medication. That

warning came over a week after Baker's first meeting with Suarez, during which

Baker noted that "Zyprexa . . . w[as] discontinued due to [Suarez's] refusal."

App'x at 575. Then, at the August 16, 2017, meeting between Suarez and Baker

shortly after the email with the Kirby records, and while Suarez was housed in

the SHU, Baker noted that, although Suarez maintained appropriate eye contact

and lacked symptoms, his "[i]nsight and judgment [were] poor." App'x at 583.

Later, on August 25, 2017, after Suarez was released from the SHU but subject to

keeplock, Baker and Reynolds met with Suarez; at that meeting, Suarez had a

mildly elevated affect and was smiling and laughing inappropriately. From this,

a jury could infer that Baker knew that Suarez faced a risk of decompensating,

that he *was* decompensating, and that disciplinary housing was a risk factor to

him.

Given the evidence of Baker's knowledge, a reasonable jury could

conclude that Baker was deliberately indifferent to Suarez's conditions of

confinement. While Baker had a more limited role in Suarez's treatment than the

other OMH defendants, she was an OMH employee with the undisputed

78

authority to divert Suarez to the FDU when she witnessed signs of decompensation. Whether her failure to do so constituted deliberate indifference to the serious risk to Suarez's well-being posed by his conditions of confinement is a determination that must be left to the ultimate trier of fact.

### b.    Medical Needs

The evidence likewise supports Baker's knowledge of the risk posed to Suarez's health by his placement in disciplinary confinement and by the lack of medication. Not only did Baker review Suarez's medical records before their first meeting, which detailed his medical history and risk of decompensation, but, as mentioned, when Baker met with Suarez on August 3, 2017, while he was in disciplinary confinement, to discuss his mental health care upon release, Baker herself noted the discontinuation of Zyprexa due to Suarez's noncompliance. Then, on August 11, 2017, Baker received, by email, Suarez's Kirby Discharge Summary, which stated: "Accepting facility to encourage medication compliance as patient will decompensate if non-compliant." App'x at 1448; 2001-02. From this evidence, a jury could infer that Baker knew Suarez was at risk of decompensating without medication.

Moreover, as discussed, record evidence supports an inference that Baker

knew that Suarez, who was not taking medication, was in fact decompensating in disciplinary confinement. While Suarez denied "experiencing psychiatric symptoms" when the two met on August 16, 2017, Baker noted Suarez's poor insight and judgment. App'x at 582-83. And on August 25, 2017, while Suarez denied hallucinations or needing medication, Reynolds's notes from the same meeting (which Baker attended) noted Suarez's inappropriate smiling and laughter.

A jury could likewise infer that Baker was deliberately indifferent because she failed to take any action to address Suarez's serious medical needs while he was incarcerated. While Baker did encourage Suarez to seek treatment *after* his release from Downstate and scheduled an appointment for him at a clinic near his mother's house, Baker did not exercise her undisputed authority as an OMH staff member to divert him for further treatment in the FDU while he was housed at Downstate, in spite of the concerning behaviors she witnessed. That evidence is sufficient to raise a triable issue of fact.

*　*　*

We note, in closing, that the dissenting opinion suggests that our holding faults defendants for failing to "continue[] Suarez's medication over his

objection." Dissenting Op. at 14. Not so. Suarez has not argued, and we do not conclude, that the only way defendants could have provided him with constitutionally adequate medical care would be to require him to continue his medication against his will. As described at length above, *see supra* Section I.C.1, defendants had a wide range of health treatment options available, including medication education and transfer to the FDU. The fact that Suarez was not taking Zyprexa undoubtedly increased his risk of decompensation, but that does not mean that the *only* available means of mitigating that risk was forcibly medicating him. By reducing the issue of adequate medical treatment to the single question of whether Suarez was receiving one medication, the dissenting opinion distorts the record and misconstrues our holding.

## IV. CONCLUSION

For the foregoing reasons, the District Court erred in granting summary judgment to defendants on Suarez's Eighth Amendment deliberate indifference claims. We VACATE the judgment and REMAND for further proceedings consistent with this opinion.

PARK, *Circuit Judge*, dissenting:

Elvin Suarez served a two-year sentence for assaulting a police officer. The day after he was released from prison, he stabbed his mother repeatedly with a kitchen knife. He blamed his actions on his medical team and prison officials from when he was imprisoned. He sought money damages, claiming that they violated the Eighth Amendment by honoring his request to discontinue his medication and by placing him in solitary confinement after he attacked corrections officers. The district court sensibly granted summary judgment to Defendants, concluding that they were not deliberately indifferent to Suarez's condition. Everyone on Suarez's medical team had observed that he was calm and not decompensating while in disciplinary housing.[1] And the prison officials had relied on the medical team's assessments in making disciplinary decisions, which were unusually lenient due to Suarez's mental-health needs. But the majority's decision concludes otherwise by misreading the record and misapplying Eighth Amendment doctrine. I respectfully dissent.

## I

"In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure

---

[1] Psychiatric decompensation is "a breakdown in an individual's defense mechanisms, resulting in progressive loss of normal functioning or worsening of psychiatric symptoms." *Decompensation*, APA Dictionary of Psychology, Am. Psych. Ass'n, https://dictionary.apa.org/decompensation (last visited Mar. 13, 2026).

of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quotation marks omitted). The Eighth Amendment thus has "both objective and subjective components." *Walker v. Schult*, 45 F.4th 598, 610 (2d Cir. 2022). A plaintiff must satisfy both to establish an Eighth Amendment violation but only the latter is at issue here.[2]

Suarez failed to present evidence that would permit a reasonable jury to find deliberate indifference as to any Defendant. Start with Suarez's medical team. The majority concludes that a jury could find that five care providers—two psychiatrists, two clinicians, and a social worker—were all deliberately indifferent on the theory that they knew of but disregarded the risk of Suarez decompensating. But the undisputed facts tell a different story. Each provider exercised good-faith diligence in caring for Suarez and independently concluded that he remained stable throughout his three-month incarceration. Even if those conclusions proved wrong in hindsight, "negligence is not deliberate indifference." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).

**A**

Suarez claims that his treating psychiatrist, Dr. Abdul Qayyum, acted with deliberate indifference by discontinuing his prescription for Zyprexa, an antipsychotic medication. According to Suarez, Dr.

---

[2] The majority correctly recognizes that the objective prong was "not adjudicated at summary judgment," *ante* at 43, so the district court may consider that issue on remand.

2

Qayyum made that decision based on Suarez's self-reporting and despite knowing that "some people believe they do not need medication, but once they stop taking it they begin to decompensate." Appellant's Br. at 33. That narrative distorts Dr. Qayyum's testimony.

Dr. Qayyum first examined Suarez on June 30, 2017. During that session, he concluded that Suarez appeared "coherent," "logical and future oriented," and that Suarez "was not experiencing delusions." App'x at 445. After Suarez refused his medication, Dr. Qayyum detailed the benefits of Zyprexa, discussed alternative medications, and discouraged Suarez from stopping the medication. He warned that "some people believe they do not need medication, but once they stop taking it they begin to decompensate." *Id*. at 445-46. Still, he believed that "if the individual is stable, not showing any signs of psychosis, the individual has the right to decline medication." *Id*. at 445.

Two more sessions followed. On July 21, Dr. Qayyum again found Suarez "coherent," with his "insight and judgment . . . fair." App'x at 447. Though he encouraged Zyprexa, Dr. Qayyum noted that Suarez cogently "exercised his right to decline medication." *Id.* And on August 24, Dr. Qayyum again discussed the benefits of medication and confirmed that, in the absence of "psychotic symptoms," he could not involuntarily administer the drug. *Id*. at 448.[3]

---

[3] To be clear, Suarez insisted on stopping the medication he now says he should have been given even after being informed of these risks. The majority suggests that Dr. Qayyum's knowledge that "some individuals

3

So on three different occasions, Dr. Qayyum assessed Suarez to be stable, largely asymptomatic, and entitled to decline medication. His clinical opinion was that the signs to which Suarez now points—inappropriate laughter, kicking a guard—were isolated events, "not evidence of psychiatric [decompensation]." App'x at 448. And all the while, he monitored Suarez's progress, encouraged him to keep taking his medication, and made sure that he continued with individual therapy.

Suarez's discontinuation of Zyprexa was thus based on his desire to stop taking the medication, as well as Dr. Qayyum's belief that Suarez "did not show any signs of psychosis" and that the circumstances did not warrant a court order for involuntary medication, which would have required that Suarez first decompensate, spend time in the Forensic Diagnostic Unit,[4] and still display psychotic symptoms. App'x at 447. Suarez now faults Dr. Qayyum, but a "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim

---

with mental illness 'believe they do not need medication, but once they stop taking it they begin to decompensate'" "alone might be sufficient to support an inference of knowledge of the risk posed to Suarez by lack of medication." *Ante* at 71. If that were correct, it is difficult to see how any inmate prescribed medication for mental illness could ever stop taking it, no matter how coherent or cogent he is.

[4] The Forensic Diagnostic Unit houses prisoners "in need of emergency mental health care." App'x at 361. Prisoners transfer into that unit at their care providers' request, "regardless of whether [they were] housed in [the Special Housing Unit] or in general population." *Id.*

4

of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The majority's view is that the Eighth Amendment required Dr. Qayyum to disregard his own observations as well as Suarez's representations that he was not experiencing symptoms because Qayyum also saw Suarez smile and laugh "inappropriately" and his mood was "slightly blunted." *Ante* at 69. But Dr. Qayyum explained that "[l]aughing inappropriately or talking to oneself is not considered a significant sign of decompensation." App'x at 448.[5] The majority disagrees with Dr. Qayyum's medical judgment, but a disagreement about an issue of medical judgment "cannot form the basis of a deliberate indifference claim." *Hernandez v. Keane*, 341 F.3d 137, 147 (2d Cir. 2003).

---

[5] The majority argues that a jury could conclude that Dr. Qayyum knew Suarez was at the risk of decompensating because he received the Kirby Discharge Summary, which expressed that Suarez risked decompensating if unmedicated. *See ante* at 71. But the fact that over a year earlier, a different physician observing different symptoms made the conclusory statement that Suarez "will decompensate if non-compliant" with his medication does not permit the inference that Dr. Qayyum knew Suarez was decompensating in August 2017. App'x at 1448. In any event, the fact that different doctors may have disagreed about Suarez's treatment does not establish a violation of the Eighth Amendment. *See White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("[N]o claim is stated when a *doctor* disagrees with the professional judgment of another doctor.").

5

**B**

Suarez next claims that Samantha Kulick—his primary clinician until his placement in the Special Housing Unit ("SHU")— "took no action" even after "witness[ing] signs of Mr. Suarez's decompensation." Appellant's Br. at 36. That too blinks the record.

During her intake session, Kulick recommended Zyprexa, although she could not prescribe it. On June 27 and July 19, Kulick observed that Suarez lacked any signs of distress and explained to him how to access mental-health services between appointments. And in examining Suarez directly after his disciplinary incident, Kulick found him to be "calm" and not "actively decompensating," so she believed that "there was no justification for removing him from SHU." App'x at 424; *see id.* ("[We are] only able to remove an individual from SHU if they are decompensating."). Kulick did not fail to act in the face of a clear risk of decompensation—to the contrary, she recommended medication, tracked Suarez's progress, and confirmed his stability.

Here too, the majority assigns an unsupportable amount of weight to the slimmest of evidence. It argues that even though Kulick observed Suarez as "having a neutral mood and an affect within the normal range," a jury could conclude that Kulick must have known that Suarez was decompensating because he had sporadic eye contact and seemed as though "he may be under the influence." *Ante* at 59. But the majority points to nothing in the record establishing that these are symptoms from which an observer should know that Suarez was "experiencing serious mental health issues and could be decompensating." *Id.* Although Kulick prepared a "Clinical

6

Assessment of Suicide Risk" form noting that Suarez's "disciplinary sanctions" and "single [c]ell" housing were potential risk factors for him, this same form also noted that Kulick "did not observe an increased risk for self-harm" following Suarez's disciplinary sanctions, and that Suarez was not experiencing current suicidal ideation or intent. App'x at 1440. Worse, the majority faults Kulick for recommending that Suarez be admitted to a residential treatment program *if* he started to decompensate. *Ante* at 59-60. But such a statement is not evidence from which a jury could conclude that Kulick was deliberately indifferent to the risk of Suarez decompensating; rather, it reflects her consistent belief that Suarez was not decompensating while she was treating him.

## C

Suarez also claims that Maura DiNardo—his SHU clinician—was deliberately indifferent because she allowed Suarez to "remain in SHU and keeplock for a month and failed to offer any meaningful treatment during that time." Appellant's Br. at 39. But DiNardo lacked disciplinary authority, so it was not her decision to place or to keep Suarez in confinement. Indeed, she advised *against* moving Suarez to SHU, though only out of "an abundance of caution," not because he "was in such a state that he needed to be removed." App'x at 416.[6]

---

[6] Although the majority asserts that DiNardo had "authority to divert Suarez," *ante* at 67, DiNardo was authorized to remove a person from SHU only "if the person was in crisis [or] if they were suicidal or w[ere] experiencing psychiatric decompensation," App'x at 414. Her evaluation

7

Nor did DiNardo shirk her treatment duties. She met with Suarez when he arrived in SHU and found "no medical basis" to remove him. App'x at 414. She conducted another formal evaluation on August 22 and again detected no "signs of psychiatric decompensation." *Id.* at 415. And she continued monitoring him while doing rounds in SHU, making certain that he did not exhibit "any symptoms relating to his mental illness." *Id.* at 414. The majority reduces the uncontroverted evidence that DiNardo continued to monitor Suarez while he was in SHU to testimony that DiNardo "would 'say hi' to Suarez through his cell door during rounds." *Ante* at 66. That mischaracterizes her testimony. DiNardo testified that she saw Suarez "Monday through Friday when [she] made rounds in SHU" and that he was "stable at all times that [she] saw him." App'x at 414. She further testified that some days all Suarez (not DiNardo) wanted to do was "say hi," but on other days he would engage her in conversation. *Id.* Further, she offered Suarez a private interview "which he declined." *Id.* There is thus no basis from which a jury could conclude that DiNardo was deliberately indifferent to Suarez's medical needs.

## D

Suarez claims that Dr. Brandon Reynolds—the psychiatrist who prepared his discharge order—also acted with deliberate indifference by allowing Suarez to remain unmedicated and to leave the prison. But Dr. Reynolds was *not* Suarez's treating physician. And he too found that Suarez "*never* demonstrated any signs nor

of Suarez was that he was neither decompensating nor suicidal, so she lacked the authority to make such a referral.

8

symptoms that would lead to the conclusion that [he] lacked the capacity to make [the] decision . . . whether to take medication." App'x at 455 (emphasis added). So Dr. Reynolds believed that Suarez retained "the right" to refuse Zyprexa and arranged for post-release treatment—including medication "as clinically indicated"—at an outpatient clinic.

Suarez tells a different tale, arguing that there is "no real question Reynolds knew Mr. Suarez was decompensating." Appellant's Br. at 41. To be sure, Dr. Reynolds found Suarez's affect "mildly elevated" and at times noticed "inappropriate smiling and laughter." App'x at 456. But even accounting for these isolated symptoms, Dr. Reynolds's clinical view was that Suarez "was able to survive safely in the community" and "did not pose a threat of danger to himself or others." *Id.* at 459; s*ee also id.* (noting that the fact that Suarez stabbed his mother after he was released "does not negate the fact that he was clinically stable at the times I met with him").

The majority says that this "inappropriate smiling and laughter" creates a genuine dispute of material fact as to whether Dr. Reynolds was required to disregard both his own clinical observations and Suarez's representations about his mental health and to conclude instead that Suarez was decompensating. *Ante* at 74. But as Dr. Reynolds explained, such a conclusion would be medically unsound "because such symptoms, by themselves, would neither meet criteria for a mood episode nor indicate clinical instability." App'x at 456. So there is no basis for concluding that he was deliberately indifferent to Suarez's medical needs.

9

**E**

Finally, Suarez claims that Chesney Baker—a social worker responsible for his discharge plan—was deliberately indifferent because she failed to provide necessary treatment despite knowing that he would decompensate without medication. But that argument also fails. Baker played "no role" in the decision to place Suarez in SHU and worked only to encourage Suarez to discuss his medication status and mental-health needs with a physician. App'x at 406. Indeed, Baker arranged for him to be seen by a clinic immediately after his release, even though such appointments often take weeks to secure.

What is more, Suarez cannot establish that Baker ignored decompensation warnings. Baker testified that "[o]n every occasion when I met with Mr. Suarez[,] he *never* presented as being in a state of decompensation" and was instead "able to engage and participate in the discussions regarding his release plan." App'x at 408-09 (emphasis added). Finding "no evidence of formal thought disorder," "hallucinations, delusions, obsessions, phobias or over-valued ideas," she deemed Suarez "mentally stable" and saw "no basis on which to transfer him to the Forensic Diagnostic Unit." *Id.* at 409. Contrary to Suarez's claims, Baker believed that she and other members of the treatment team took "all the necessary actions" in caring for Suarez and facilitating his safe release. *Id.* at 410.

In sum, no reasonable jury could find that any of the five treatment providers operated with "a state of mind equivalent to the familiar standard of recklessness as used in criminal law." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation marks omitted).

10

All five repeatedly evaluated Suarez, discovered no signs of decompensation, played no role in the decision to discipline him, and identified no need to transfer him from SHU. The majority relies mainly on isolated instances of "inappropriate" laughter or smiling along with the fact of confinement and Suarez's medical history, but it points to nothing from which a jury could conclude that these symptoms made the treatment providers aware of the risk that Suarez was decompensating. Even with the inappropriate benefit of hindsight, *see Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303-04 (4th Cir. 2004) (noting that the subjective awareness prong is concerned with "the risk as [the Defendants] perceived it," "not as it now may be perceived enlightened by the benefit of hindsight"), these symptoms on their own are not considered significant signs of decompensation, and *none* of the five treatment providers viewed them as signs that Suarez was in fact decompensating.

## II

Suarez's arguments as to the two prison officials fare no better. Suarez first claims that Superintendent Robert Morton was deliberately indifferent because he failed to refer Suarez for treatment and to remove him from SHU. But Morton carried "no authority to evaluate whether an incarcerated individual required medication." App'x at 358. Still, he "knew that at any time if the penalty aggravated [Suarez's] mental health condition," the treatment providers "would remove him" and provide "immediate mental health treatment." *Id.* at 363. And Morton confirmed that Suarez's confinement in SHU—already "partially suspended" in recognition of his mental-health history—accounted for Suarez's condition and

11

was not "excessive."  *Id.* at 347.  Suarez's treatment providers also uniformly observed that Suarez was not in fact decompensating while he was in disciplinary housing, and it was not deliberate indifference for Morton to credit their medical opinions.  *See Brock*, 315 F.3d at 164 (no deliberate indifference where superintendent deferred to treating physician's recommendation).

Suarez next argues that Peter Horan—the prison official who conducted the disciplinary hearing—was deliberately indifferent because he "simply ignored DiNardo's treatment advice" in sentencing Suarez to disciplinary confinement.  Appellant's Br. at 44. When Suarez threatened to kill people, he "posed a threat to the safety of staff or other inmates" with his "verbal threats coupled with physical contact with staff," so Horan ordered that Suarez be confined to disciplinary housing to incapacitate him and to deter future assaults.  App'x at 347.  But nothing about this sanction shows that Horan ignored DiNardo's treatment advice or was deliberately indifferent to Suarez's mental-health needs.

Horan accounted for Suarez's "mental health status" by "basically giv[ing] him the lightest disposition I have eve[r] given on an assault on staff in my career" and removing Suarez from SHU "as quickly as possible."  App'x at 1069, 1092.  Horan's notes from the disciplinary hearing memorialized that Suarez's "mental health issues were taken into consideration" and that a portion of the sanctions were "suspended" as a result.  *Id.* at 344.  And Horan was "aware that should Mr. Suarez begin to suffer mental-health issues, [the treatment providers] could and would have him removed to the

12

Forensic Diagnostic Unit." *Id.* at 338.[7] What is more, Horan testified that "[a]t no time during the hearing [] did I believe that Mr. Suarez was decompensating or at the risk of becoming violent." *Id.* In fact, Horan explained that "I would not have sentenced Mr. Suarez to keeplock if I believed that keeplock would cause him harm." *Id.* Deliberate indifference in this context means that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*." *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (emphasis added) (quotation marks omitted). But nothing in the record would permit a jury to conclude that Horan actually drew the inference that this "light" punishment posed a serious risk to Suarez's health.

Suarez has thus failed to establish a genuine dispute of fact as to either Morton or Horan. Neither played a role in his mental-health treatment or "deliberately def[ied] the express instructions of [Suarez's] doctors." *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (quotation marks omitted). Both took steps to assure themselves that Suarez was stable, receiving adequate care, and capable of SHU

---

[7] The majority's citation to *Vega* is thus inapposite. *Ante* at 45 (quoting *Vega v. Semple*, 963 F.3d 259, 273-74 (2d Cir. 2020)). In *Vega*, we concluded that there was a triable issue regarding deliberate indifference where plaintiffs alleged that defendants knew that inmates "faced substantial risk of serious harm from indoor radon exposure and that Defendants disregarded that risk *by failing to take reasonable measures to abate it*." 963 F.3d at 274 (emphasis added). But Horan took "reasonable measures" to abate the risk that disciplinary housing posed to Suarez by partially suspending Suarez's sentence in consideration of his mental-health needs.

confinement.  And both relied on the fact that the treatment providers monitoring Suarez's disciplinary confinement would intervene if necessary.  Suarez thus fails to show that Morton and Horan knew of and disregarded an excessive risk to inmate health or safety.  *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020).

## III

In the majority's view, Defendants (1) should have continued Suarez's medication over his objection, despite the unanimous opinion of the medical team that he was stable; and (2) should not have confined Suarez to disciplinary housing, despite the danger he posed to others.  The Eighth Amendment does not compel this result.[8]

For a plaintiff to prevail on a deliberate indifference claim, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Darby v. Greenman*, 14 F.4th 124, 128

---

[8] Indeed, forcing Suarez to continue his medication may have raised other concerns.  *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (recognizing "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment").  Although the majority disclaims this implication of its decision, *ante* at 80-81, it states elsewhere that a Defendant's awareness that some people who discontinue medication begin to decompensate "*alone* might be sufficient to support an inference of knowledge of the risk posed to Suarez by lack of medication," *id.* at 71 (emphasis added).  And the majority repeatedly concludes that Defendants were deliberately indifferent to Suarez's medical needs because they knew about the risk posed by the "lack of medication," even though Suarez affirmatively requested to discontinue that medication.  *Id.* at 55, 58, 63, 71, 76, 79.

(2d Cir. 2021) (quotation marks omitted). The majority satisfies itself that a jury could find Defendants were "aware of facts from which the inference could be drawn." *Id.*; *see, e.g.*, *ante* at 47 (concluding that there is a triable issue on deliberate indifference because Defendant "knew of Suarez's serious mental illness and witnessed signs of decompensation"). What is missing from the majority's analysis is evidence from which a jury could conclude that Defendants actually knew Suarez was decompensating. The majority repeatedly concludes that because something is possible, a reasonable jury could conclude it happened. *See, e.g.*, *ante* at 61 ("a reasonable jury could conclude that Kulick recognized that Suarez would decompensate without medication, knew his medication had been discontinued, and witnessed signs of decompensation"). That is unsound logic and distorts the summary judgment standard.

Every physician who observed Suarez agreed that he was not decompensating. And there is no suggestion that Defendants based their medical and disciplinary decisions on an "improper motive" rather than their "sound medical judgment." *Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir. 1998). Instead, Suarez simply believes that Defendants should have drawn a different inference from the one that they did about the risk that he would decompensate.

The majority's decision faults prison officials for failing to predict that Suarez would decompensate upon release and brutally stab his mother. It incentivizes officials to assume that mentally ill patients showing any signs of decompensation are actually decompensating. And it warns prison officials that someone with Suarez's "mental health profile should not be subject to segregated

15

housing or keeplock status" even when his behavior threatens staff and other inmates. *Ante* at 48.

I respectfully dissent.